167 So. 731

**SOUTHERN RY. CO. v. SHERRILL.**

8 Div. 657.

Supreme Court of Alabama.

April 16, 1936.

W. H. Mitchell, of Florence, and R. H. Scrivner and Stokely, Scrivner, Dominick & Smith, all of Birmingham, for appellant.

185

W. A. Denson, of Birmingham, for appellee.

THOMAS, Justice.

The suit was under the homicide statute (Code 1923, § 5696), and the trial had on count Z, which reads as follows:

"Plaintiff who sues as the executrix of the estate of Wiley Earnest Sherrill, deceased, claims of the defendants, One

Hundred Thousand Dollars ($100,000.-00), damages, for that on to-wit, December 27, 1933, plaintiff's intestate, while in such close proximity to the railroad track of the defendant, Southern Railway Company, as to be struck by an engine moving along said track, was struck by a locomotive of said defendant while said locomotive was travelling on said track at McWilliams Crossing, near Cherokee in the County of Colbert, State of Alabama, and killed. Plaintiff avers at the time of said killing of said intestate by said locomotive, the defendant R. A. Thompson was in the employment of the defendant, Southern Railway Company, as a fireman, and was engaged in the active performance of the duties of said employment in and about the operation of said locomotive at said time. Plaintiff avers J. R. Hackworth was at said time and place in the employment of said defendant, Southern Railway Company, as an engineer, and was the engineer on said locomotive, at said time and place, which killed plaintiff's intestate. Plaintiff avers the defendant W. H. Cox was in the employment of the defendant, Southern Railway Company, as a conductor and was engaged in the active performance of the duties of said employment in and about the operation of said train at said time as conductor of said train. Plaintiff avers the defendant, G. K. Counts, was in the employment of the defendant, Southern Railway Company, as a flagman, and was engaged in the active performance of the duties of said employment in and about the operation of said train at said time as flagman of said train. Plaintiff avers the death of her intestate was proximately caused by the negligence of the defendants, R. A. Thompson, W. H. Cox, G. K. Counts, and said engineer, J. R. Hackworth, while each was in the employment of said defendant, Southern Railway Company, and each was acting within the line and scope of his employment and while each were (was) in the active performance of the duties of their (his) employment, said Hackworth as engineer, and said Thompson as fireman, and said Cox as conductor of said train, and said Counts as flagman of said train, of said locomotive which killed plaintiff's intestate at said time and place, which negligence consisted in this: said Hackworth and said Thompson, and said Cox and said Counts, after becoming aware of the peril of said locomotive colliding with plaintiff's intestate, and while acting within the line and scope of their employment, negligently failed to use all of the means at their command to avoid said locomotive colliding with said intestate, when by the use of said means said locomotive would have been prevented from colliding with said intestate with such violence as to kill intestate, and intestate's death would have been avoided."

Pleas 5, 6, and 7, as answer to count Z, were to the effect that plaintiff's intestate knew of the approach of said train and negligently attempted to cross defendant's tracks.

The gravamen of the complaint is the negligence of defendant's servants or agents, after the discovery of intestate's perilous position upon the track of the defendant, to use "all the means at their command to avoid said locomotive colliding with said intestate, when by the use of said means said locomotive would have been prevented from colliding with said intestate with such violence as to kill intestate, and intestate's death would have been avoided."

Count Z was no doubt drawn under Randle v. Birmingham Railway, Light & Power Co., 169 Ala. 314, 53 So. 918.

The assignments of error are considered as presented by counsel. The rule for giving or refusing the general affirmative charge is well understood. McMillan v. Aiken et al., 205 Ala. 35, 40, 88 So. 135.

■ The facts necessary to support count Z are: (1) Discovery by defendant's agent in charge of intestate's peril or immediate and dangerous proximity thereto, and (2) his negligence thereafter in failing to use all the means at hand properly and in order to avoid intestate's injury and death. The jury were authorized to find that the tendencies of negligence of defendant in that behalf, after discovery of the decedent's peril or dangerous proximity thereto, consisted in the failure to duly warn intestate of his peril, or in failure to stop or reduce the speed of the train in approaching the point of collision. The jury may have found or inferred from the evidence that intestate was driving his car along the public road, in advance of and in the direction from which the engine and train proceeded,

in plain view of the engineer; that the highway on which he was driving was parallel with the railroad track, close thereto and clearly visible; that the intestate was driving his car to the point where the highway crossed the railroad track, and in so doing passed through the open gate of fencing along that highway, and at such crossing at a point 35 feet from the railroad track, he so entered upon such highway crossing and proceeded to the crossing over the railroad track as that only the back wheels of the automobile remained on the crossing and track, where it was struck by the engine causing his injury and death; that during this time (and at all times) defendant's engineer in charge was looking forward from his place on the engine and had one hand near or on the whistle cord and the other on the air-brake lever. There was a dispute in the evidence as to whether he did or did not sound an alarm to warn intestate of his immediate and impending peril from the approaching train. The evidence is undisputed that he did not reduce the speed or stop the train before the collision.

We have indicated there was evidence that intestate had his back to the train until he reached the point of crossing and turning therefor; and that he was unaware at all times, to the instant of collision, of the approach of the train. The jury might have further reasonably inferred that the engineer observed intestate as he proceeded; observed that he was ignorant of the approaching train, or that he was not reducing his speed as he approached the track, but did not sound the whistle or reduce the speed.

The point of collision was a public road or a long-used crossing—a fact well known to the engineer.

■ J. R. Hackworth, the engineer in charge, as a witness for plaintiff, stated that his engine was properly equipped and in good condition; that he was well acquainted with the situation; was going down grade to that crossing; the track was dry; that he was looking ahead and had been so looking from Cherokee "to where he struck the man"; that he had observed the traffic and was so doing "at that time"; that the train ran "thirty-three cars' length beyond the crossing where Sherrill was struck" and witness was forty feet west of the crossing when he first saw Sherrill's automobile; that his eyesight was good and it was broad daylight; that as he approached the crossing he was looking at the crossing; was looking "straight at that place." The track was straight at this point for 4 miles west of the crossing; he first saw the automobile as it was entering up on the track about 6 or 8 feet of the track, and he was about 40 feet from it, proceeding about 10 miles an hour; that he blew the "whistle as an alarm." The witness further stated that "there was no obstruction there to prevent" him seeing the automobile at the railroad track; that he could give signals at the same time he used the emergency brake, and he did both in this instance; that the engine struck the rear wheel of the left side of the automobile. At the time of the accident he was running about 40 miles an hour and "was keeping the lookout"; that before he reached this crossing his bell was ringing and had been ringing continuously for about a quarter of a mile; that the crossing was a private crossing, the railway track being fenced on both the north and south sides; that the grade started a little way west of the crossing and extended about a quarter of a mile east, is level about 60 or 100 feet; that as he ran through there he was keeping a lookout in front of the engine and did not "see anybody in the car," they were nearly on the track when he observed the car about 6 or 8 feet; the automobile did not stop after he saw it; he had his hand on the whistle before stopping; did not have his hand on it until he saw the automobile, but put his hand there when he saw the car and the emergency; did all a good engineer could do to slow up or stop a train; put sand on the track; did not reverse the engine as that would have done no good.

Mrs. Roach, a witness for plaintiff, testified that she was in the back seat of the car at the time Mr. Sherrill was killed; nobody else was in the car but Mr. Sherrill and herself; that when she first saw the train it was 100 feet or over from them; her hearing was good on that occasion; that the whistle did not blow and the bell did not ring before the collision; that when she first saw the train the front wheels of the automobile had just gotten up on the track, she was sitting on the back seat and her father was sitting on the front seat; that the front wheels of the automobile were just over the first rail when she saw the

train 100 feet away, and at the moment she first saw the train 100 feet away her father had not looked at the train, did not look in that direction at any time; that she was looking forward from the back seat from the time they left the highway and started toward the tracks, being about 35 feet from the highway to the first rail of the track; that there is an incline and "you ascend a hill to get up to the track from the highway," about 25 feet from the foot of the hill to the first rail and the little incline is steep; that her father did not slow up in approaching the track, nor along the whole road until the train hit him; that when she first saw the train she looked up, and, of course, as soon as she could think, she screamed: "There is a train." By that time the wheels were over the other track and that is the last she knew.

And on cross-examination witness said that there was a gate in the railroad fence and it was open when they got there, it stays open most all the time; that the fence is on the south side of the track about 35 feet from it; they drove through the fence at about 15 miles an hour, the same speed they drove on the road, going up the incline at about 15 miles an hour; that the car they were driving did not stop, did not pause, and they did not stop, look, and listen, and her Daddy did not in driving the car—did not slow up the car at all, but went right up the track; that they were not running very fast and the whistle on the engine was not blown; that her father did not slow up the car but went right on the track and as they went up the incline toward the track she guesses she could have seen a train coming a mile or two, but did not try; the first time she looked the front wheels of the car were over the south rail of the track; they had the front wheels of the car over the south rail of the track and then witness looked toward the direction the train was coming from; had not heard it and did not hear it rumble and "a bell did not ring"; that the whistle did not blow and she did not hear it blow at the crossing a mile west of it; if it had blown, she would have heard it and she did not hear a quick alarm when she was struck; "the bell was not ringing when" she looked at the train; witness imagines they were going 15 miles an hour and continued that until they were struck without any pause; judged the train to be 100 feet away when she saw it; by that, she means the nose of the engine was about 100 feet from the crossing or more.

The witness Couch testified, among other things, that he was an experienced engineer; that that train, running 40 miles an hour, seeing an automobile running 15 miles an hour, with the front wheels over the rail, could have been delayed enough to let the automobile over the tracks. On cross-examination this witness testified as follows:

"Q. If this run that we talked about this morning at McWilliams crossing, if the emergency brakes were thrown when the front end of the engine was forty feet from the crossing, how far would the train travel before the brakes took effect, train was stopped? A. Don't know exactly, the brakes would take effect about in a fractional part of a second, but not even Westinghouse can state the exact time.

"Q. There is an interval after the emergency brake is thrown before it has any effect on the train, is that not true? A. A fractional part of a second you cannot gage that, nobody can gage it. It is almost instantaneously. When the brake first takes effect it slows the train and it gradually slows and then stops gradually.

"Q. If this train was traveling forty miles an hour and forty feet from the crossing, how far would it travel and how close would it get to the crossing in one second? A. Oh, possibly ten feet or so, never figured it.

"Q. Would it go thirty feet in one second if traveling thirty miles an hour? A. Couldn't be sure. * * *

"Q. Throwing the brakes in emergency how far would a train of that weight and size and number of cars and that styled engine travel before coming to a halt? A. Three hundred fifty feet, possibly four hundred.

"Q. As an expert you declare that the train ought to be stopped in that distance by the use of the emergency? A. By the looks of the grade, yes, sir. I can't tell you the exact distance that the train would move towards the tracks traveling forty miles an hour before the emergency would have an effect on it."

And on redirect examination:

"Q. If the engineer had applied the emergency on that train as has been described to you in the hypothesized question, where would that train have stopped? * * * A. Well, the train would have stopped three hundred to three hundred and fifty

feet on that grade from where the emergency was applied."

The witness Watkins testified that he saw the collision and "did not hear the whistle blow before Mr. Sherrill's automobile was struck."

The witness Stewart, an experienced engineer, testified for defendant as to the locus in quo in question as follows:

"I know about the road·at and along McWilliams crossing and' that there is a grade there before you get to it and a little grade after you leave it and a flat place at the crossing. If a train was running along there by a capable engineer who had had experience and if he had thirty-three cars, twenty-seven loaded and six empties and if the train weighed from nine hundred to one thousand tons, and if he was called on to stop the train with kind of engine, McCarty type, he has made a good stop if he stopped the train within the length of the train—length of the engine and cars. That would be a skillful stop. It could not have been stopped within a distance of three hundred fifty, four hundred or five hundred feet. It could not have been stopped any shorter than the length of the train and he did a good stop if he did that. If the train was within forty feet of the crossing when a man with the front wheels of his car over the rails of the track, and if the engineer applied his emergency brakes it would not have been possible for the train to have been so retarded as to permit the automobile to get over the tracks. If the automobile was six or eight feet from the track that the train was on and was running ten or fifteen miles an hour, and if the engine was forty feet away from the crossing running forty miles an hour, the engineer could not, by applying the emergency, slow up the train so as to enable the automobile to get over the tracks in safety. When. the brake is applied on a locomotive going forty miles an hour, it goes on right now. The train could not have been stopped or slowed up in such a way as to have permitted this car to get across."

The witness McWilliams testified as to the crossing:

"I know the crossing and the use of it. It is used by people in that community coming and going out of my place. About thirty people lived on my premises last year, including men, women and children, white and black. They work the land and help me run the dairy. There are fourteen school children, but there was no school in the Christmas Holidays. Leaving out the school children, I go in and out of the place three or four times a day. No considerable number of people off my place use the crossing and folks beyond my place do not use it because there is no gate through my fence. The railroad gate and the railroad fence is the only gate entering my premises and nobody uses that gate unless using my place, coming or going off of it. It was fenced in 1927."

Witness Hobson testified that "the track of the train is 3 or 4 feet from the highway, from inside of the fence to the railroad is about 35 feet"; that "before you leave the highway and go toward the railroad track you go a little bit down grade then up grade to ·the railroad track"; that his "judgment is it is practically level." This evidence contains contradictory statements and made a case for the jury.

■ The duty of an engineer, on discovery of peril of one on or near the track, is covered by the decisions. Louisville & N. R. Co. v. Calvert, as Adm'r, 172 Ala. 597, 55 So. 812. In Thompson & Donohoo v. Mobile & O. R. Co., 211 Ala. 646, 101 So. 441, it was declared that the engineer's duty toward the driver of a truck approaching a crossing began when he discovered the peril of the truck, which depended, not on the moment he first saw the truck, but on the relative distances from the crossing, relative speeds of train and car, relative stopping distances, and the presence or absence of movements or apparent movements to stop the truck proceeding toward or on the crossing. The following observation was made in that case:

"The duty of the engineer, now under review, began when he discovered the peril of the truck. This may or may not be the same moment he first saw the truck. The relative distances from the crossing, relative speeds, relative stopping distances, the presence or absence of movements or apparent movements to stop the truck, all enter into the inquiry whether there was apparent danger of a collision. In such conditions a collision, or no collision, often depends on the doings of only a few seconds. The measure of duty is that of careful, prudent men in view of the imminence of danger. When peril appears, the engineer must use all means known to skillful men in his position to avert an accident." 211 Ala. 646, 647, 101 So. 441, 442.

These are questions for the jury.

The failure to give "a quick, loud blast of the whistle" to warn of danger held

sufficient to make a jury question in Snider v. Alabama Great Southern R. Co., 210 Ala. 119, 97 So. 209; Alabama Great Southern R. Co. v. Sanders, 203 Ala. 57, 82 So. 17; Alabama Great Southern R. Co. v. McWhorter, 156 Ala. 269, 47 So. 84.

In Mobile Light & R. Co. v. Gadik, 211 Ala. 582, 584, 100 So. 837, 839, it was said:

"The law exacts a high degree of care of a motorman upon discovery of peril to persons or property at a public crossing—a care measured by the duty to protect life and property. He should be watchful, alert, and capable; must promptly use all the means known to persons of skill in his position to avoid an accident. The moment of time when these new duties begin cannot well be better defined than by the natural import of the words, 'upon discovery of peril.' An automobile seen approaching a crossing at a safe distance and at usual speed does not within itself suggest peril. The driver may be taken to have the use of his senses, and to exercise the ordinary care which the occasion demands. But, if the automobile continues to approach without slowing up, or the driver is seen to be inattentive, so that the situation suggests a probable collision unless prompt measures are taken, the duties of the motorman begin. One of the duties is usually to give a warning signal. If the automobile driver appears inattentive to the approach of the street car, this is an urgent duty. It should be given before it is too late to avoid a collision."

Touching the duty of an engineer, it was declared in Johnson v. Louisville & N. R. Co., 227 Ala. 103, 148 So. 822, that such engineer could not indulge the assumption that the motorist approaching the track at the crossing would not go on the track beyond the time when his danger became imminent; that until it became apparent to the engineer that the motorist was unaware of the train's approach and that his automobile would probably enter the zone of danger, it could not be said that the engineer discovered the motorist's peril, and if this peril was discovered in time to sound the warnings at hand and the engineer failed to do so, he was guilty of subsequent negligence; that the motorist had the burden, under a count charging subsequent negligence, of proving that negligence of the engineer proximately caused his injury.

█ It is further declared in Central of Georgia Ry. Co. v. Bates, 225 Ala. 519, 521, 144 So. 9, 11, that although the engineer kept a proper lookout, and gave due signals, yet the jury may have reasonably inferred (the evidence being open to such inference) that no effort was made to stop or reduce the speed of the train, when and after the motorist entered into the zone of danger and peril. In this case, a timely signal, given after the motorist turned toward the track to cross, might have saved his entrance thereupon, or, being thereon, hastened his departure from the track. This indicates there was no error in refusing the general affirmative charge.

█ There was no error in overruling defendant's objection to the following question propounded by plaintiff to the witness Couch:

"Q. Under this state of facts what would you do:

" 'Here is a train composed of thirty three cars, twenty-seven loaded and six empties. The tonnage from nine hundred to one thousand tons. The engine weighs two hundred ninety two thousand five hundred pounds, about one hundred forty-six tons and a quarter to be exact. Four drivers to the side; McCarty type; Number forty-five seventeen; going up a grade such as you saw this morning at the rate of forty miles an hour. The engine is one hundred feet from the crossing. I mean the point of his engine is one hundred feet from the crossing, when he sees an automobile going at the rate of fifteen miles an hour. He says he saw the automobile at six or eight feet from the track and that he was forty feet from the crossing at that time and the automobile was going about ten miles an hour. You hypothesize your answer on the facts you would testify that the train was said one hundred feet from the crossing and at that time the automobile's front wheels had passed over the first rail, and the automobile going ten miles an hour, I will ask you whether or not application of a train equipped with all modern appliances in perfect condition, good condition, nothing wrong with them, I ask you whether or not by an application of the emergency under those conditions you could decrease the speed of that train so as to allow the automobile to pass over the crossing without harm?' "

That witness did not answer the question as propounded, modified the same as he stated, and then answered: "You want to know if that train could have been running forty

miles an hour, seeing an automobile running fifteen miles an hour, with the front wheels over the rail, if that train could have been delayed enough to let the automobile over the tracks? The answer is it could." There was no motion to exclude the answer made as not being responsive.

Defendant's refused charge 17 invaded the province of the jury, placed stress upon particular parts of the testimony, and gave undue prominence to that part of the evidence touching upon subsequent negligence as to decreasing speed or stopping the train, without reference to other evidence as to the failure to give signals, a fact competent to attain a like or same result. Sulzbacher et al. v. Campbell, 219 Ala. 191, 121 So. 706; Pollard v. State, 193 Ala. 32, 69 So. 425.

Plaintiff's given charge 6-F was approved in Alabama Great Southern Railroad Co. v. Frazier, 93 Ala. 45, 51, 9 So. 303, 30 Am.St.Rep. 28.

There was no error in giving to the jury for plaintiff, charge 10f. The damages recoverable are punitive and exemplary, and the intentional conduct on the part of a defendant is not a necessary predicate for the imposition of such damages. Richmond & Danville Railroad Co. v. Freeman, 97 Ala. 289, 294, 11 So. 800; Esdale v. Baxter, 219 Ala. 256, 257, 122 So. 12.

There was no error in giving plaintiff's written charges 48f, 49f and 53f. Richmond & Danville Railroad Co. v. Freeman, supra.

Plaintiff's charge 11f is a correct statement of the law. Alabama Power Co. v. Goodwin, 210 Ala. 657, 659, 99 So. 158; Kansas City, M. & B. R. Co. v. Sanders, 98 Ala. 293, 309, 13 So. 57.

There was no error in giving plaintiff's charge 13f. If an explanatory charge was thought necessary, it should have been requested. Birmingham Railway, Light & Power Co. v. John E. Rutledge, 142 Ala. 195, 204, 205, 39 So. 338; Montgomery Light & Water Power Co. v. Thombs, 204 Ala. 678, 683, 87 So. 205. It was not contrary to Randle v. Birmingham Railway, Light & Power Co., 169 Ala. 314, 53 So. 918, or Richmond & Danville Railroad Co. v. Freeman, supra.

Charges for plaintiff, viz., A–6, A–7, A9–¼, A52–¼, A59, A62, 19–A–¼, 27–A–¼, 28A, 30–A–¼, 45–A, 53a, 55a, 56a, are considered as a group, and urged as error on the assumption that defendant was entitled to the general affirmative charge. Some, if not all, of these charges are good and the argument as made is within the group rule of City of Montgomery v. Moon, 208 Ala. 472, 94 So. 337, Morgan-Hill Paving Co. v. Thomas, 223 Ala. 88, 134 So. 480, holding, that where several assignments to the refusal of charges, argued as one, will not be considered, where one charge is properly refused.

The motion for a new trial presents questions we have discussed, and further the alleged grounds that the "judgment was for an excessive amount," and the verdict was wrong and unjust, based, as it was, largely on the testimony of Mrs. Roach and Couch. It is urged that neither of these witnesses had an intelligent conception of time, speed, or distances. The statements by a witness of such facts are but statements of best judgment, based on common observation of such a matter that may be tested by a cross-examination of the witness, and the value of such testimony is for the jury. 22 C.J. pp. 567–573. It is insisted that there is no proper argument under our rule to present the question of excessiveness of a verdict. Appellant's counsel cited authorities and urged the motion, specifically stressing that feature. This was sufficient under Georgia Cotton Co. v. Lee, 196 Ala. 599, 72 So. 158, to present for consideration that feature of the motion for a new trial, whether the verdict rendered was excessive under the evidence and our decisions. Montgomery Light & Water Power Co. v. Thombs, 204 Ala. 678, 683, 87 So. 205; Southern Railway Co. v. Montgomery, 229 Ala. 456, 157 So. 854; Parke v. Dennard, 218 Ala. 209, 118 So. 396; Randle v. Birmingham Railway, Light & Power Co., 169 Ala. 314, 53 So. 918.

The rule for granting or refusing a motion for new trial on such grounds is contained in the above-cited authorities and in Cobb v. Malone & Collins, 92 Ala. 630, 9 So. 738, and Alabama Midland Railway Co. v. Johnson, 123 Ala. 197, 26 So. 160.

The evidence has been carefully examined and all reasonable presumptions of correctness of the verdict and judgment below indulged. Is the preponderance of the evidence against the verdict and so decided as to clearly convince the court that it was wrong and unjust? If so decidedly in favor of the defendant as to leave no substantial doubt but that the verdict was wrong and unjust, the

new trial should be granted; if not, the verdict and judgment will not be disturbed. Davis v. Miller, 109 Ala. 589, 19 So. 699; Anderson et al. v. English & Webb, 121 Ala. 272, 25 So. 748. Such is the rule that has long, and now prevails. Montgomery Light & Water Power Co. v. Thombs, 204 Ala. 678, 683, 87 So. 205.

It must be admitted that in a case such as this the amount of damages must depend upon the degree of culpability of the respective parties that entered into and proximately caused the act and result eventuating in the death of plaintiff's intestate. Here, the cause of the injury and death for which the suit is brought was the concurrent negligent acts of the defendant and plaintiff, resulting in death—the negligent failure of defendant to use all the means at hand properly and in order to warn and reduce the speed after discovery of intestate's peril, and the negligence of intestate in not stopping, looking, and listening before proceeding upon the track in proximity to defendant's approaching train causing his injury. In the light of these facts, damages awarded by the jury were excessive—because of this concurrent negligence, proximately causing such result and brought about by the acts of both parties as indicated. Southern Ry. Co. v. Montgomery, 229 Ala. 456, 157 So. 854.

We may digress to observe that the question of a variance is not presented within our rules to be applied in a proper case, and where amendment may be allowed, if desired; nor is it insisted upon here.

We have considered the pleading as last amended—by the elimination of all counts, except count z charging subsequent negligence—and the argument of counsel, and find that the federal rule of contributory negligence is not presented or urged of application.

We here cite the following cases from this jurisdiction and from the Supreme Court of the United States, wherein the plaintiffs' pleadings were those of employees seeking recovery under the Federal Employers' Liability Act (45 U.S.C.A. §§ 51–59): Louisville & N. R. Co. v. Parker, 223 Ala. 626, 651, 138 So. 231; Louisville & N. R. Co. v. Jacobson, 218 Ala. 384, 118 So. 565; Louisville & Nashville R. Co. v. Fleming, 194 Ala. 51, 69 So. 125; Southern Railway Co. v. Peters, 194 Ala. 94, 69 So. 611; Illinois Central Railroad Co. v. Skaggs, 240 U.S. 66, 36 S.Ct. 249, 60 L.Ed. 528; Unadilla Valley Railway Co. v. Caldine, Adm'r, 278 U.S. 139, 49 S.Ct. 91, 73 L.Ed. 224, 232; Atlantic Coast Line Railroad Co. v. Driggers, 279 U.S. 787, 49 S.Ct. 490, 73 L. Ed. 957; St. Louis Southwestern Railway Co. v. Simpson, as Adm'x, 286 U.S. 346, 52 S.Ct. 520, 76 L.Ed. 1152.

The case of Baltimore & Ohio Railroad Co. v. Dora Goodman, Adm'x, 275 U.S. 66, 48 S.Ct. 24, 72 L.Ed. 167, 56 A.L.R. 645, was not an employee's case, but was for a review of a judgment of the United States Circuit Court of Appeals [10 F.(2d) 58, 59] affirming a judgment rendered in the first instance by the Federal District Court, and was qualified in Pokora v. Wabash Railway Co., 292 U.S. 98, 54 S.Ct. 580, 78 L.Ed. 1149, 91 A.L.R. 1049; 56 A.L.R. 659, note, as to the duty of the driver in the premises; both being cases wherein the view of a grade crossing was obstructed to the driver of the car. These cases do not rule here.

We do not find in the foregoing cases that the pleadings for plaintiffs charged subsequent negligence alone; as in the instant case.

Holding, as we do, that the damages awarded were excessive, the sum of $10,000 is considered adequate for damages recoverable; therefore, under the authority of section 6150, Code 1923, the verdict is hereby reduced to the sum of $10,000, and, if plaintiff remits all amounts in excess of said sum by filing a remittitur with the clerk of this court within thirty days, the judgment of the circuit court will be affirmed; otherwise the judgment will be reversed and the cause remanded.

Affirmed conditionally.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.