# INTERNATIONAL UNION, UNITED AUTOMOBILE, AIRCRAFT AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW–CIO) ET AL. v. RUSSELL.

No. 21.   Argued December 11–12, 1957.—Decided May 26, 1958.

*J. R. Goldthwaite, Jr.* argued the cause for petitioners. With him on the brief were *Harold A. Cranefield* and *Kurt L. Hanslowe.*

*Norman W. Harris* argued the cause and filed a brief for respondent.

MR. JUSTICE BURTON delivered the opinion of the Court.

The issue before us is whether a state court, in 1952, had jurisdiction to entertain an action by an employee, who worked in an industry affecting interstate commerce, against a union and its agent, for malicious interference with such employee's lawful occupation. In *United Workers* v. *Laburnum Corp.*, 347 U. S. 656, 657, we held that Congress had not "given the National Labor Relations Board such exclusive jurisdiction over the subject matter of a common-law tort action for damages as to preclude an appropriate state court from hearing and determining its issues where such conduct constitutes an unfair labor practice" under the Labor Management Relations Act, 1947, or the National Labor Relations Act, as amended.[1]  For the reasons hereafter stated, we uphold the jurisdiction of the state courts in this case as we did in the *Laburnum* case.

This action was instituted in the Circuit Court of Morgan County, Alabama, in 1952, by Paul S. Russell,

---

[1] 61 Stat. 136, 29 U. S. C. § 141.

the respondent, against the petitioners, International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, CIO, an unincorporated labor organization, here called the union, and its agent, Volk, together with other parties not now in the case. Russell was a maintenance electrician employed by Calumet and Hecla Consolidated Copper Company (Wolverine Tube Division) in Decatur, Alabama, at $1.75 an hour and earned approximately $100 a week. The union was the bargaining agent for certain employees of that Division but Russell was not a member of the union nor had he applied for such membership.

The allegations of his amended complaint may be summarized as follows: The union, on behalf of the employees it represented, called a strike to commence July 18, 1951. To prevent Russell and other hourly paid employees from entering the plant during the strike, and to thus make the strike effective, petitioners maintained a picket line from July 18 to September 24, 1951. This line was located along and in the public street which was the only means of ingress and egress to the plant. The line consisted of persons standing along the street or walking in a compact circle across the entire traveled portion of the street. Such pickets, on July 18, by force of numbers, threats of bodily harm to Russell and of damage to his property, prevented him from reaching the plant gates. At least one striker took hold of Russell's automobile. Some of the pickets stood or walked in front of his automobile in such a manner as to block the street and make it impossible for him, and others similarly situated, to enter the plant. The amended complaint also contained a second count to the same general effect but alleging that petitioners unlawfully conspired with other persons to do the acts above described.

The amended complaint further alleged that petitioners willfully and maliciously caused Russell to lose time from

his work from July 18 to August 22, 1951, and to lose the earnings which he would have received had he and others not been prevented from going to and from the plant. Russell, accordingly, claimed compensatory damages for his loss of earnings and for his mental anguish, plus punitive damages, in the total sum of $50,000.

Petitioners filed a plea to the jurisdiction. They claimed that the National Labor Relations Board had jurisdiction of the controversy to the exclusion of the state court. The trial court overruled Russell's demurrer to the plea. However, the Supreme Court of Alabama reversed the trial court and upheld the jurisdiction of that court, even though the amended complaint charged a violation of § 8 (b)(1)(A) of the Federal Act.[2] 258 Ala. 615, 64 So. 2d 384.

On remand, petitioners' plea to the jurisdiction was again filed but this time Russell's demurrer to it was sustained. The case went to trial before a jury and resulted in a general verdict and a judgment for Russell in the amount of $10,000, including punitive damages. On appeal, the Supreme Court of Alabama reaffirmed the Circuit Court's jurisdiction. It also affirmed the judgment for Russell on the merits, holding that Russell had proved the tort of wrongful interference with a lawful occupation. 264 Ala. 456, 88 So. 2d 175. Because of the importance of the jurisdictional issue, we granted certiorari. 352 U. S. 915.

---

[2] We assume, for the purposes of this case, that the union's conduct did violate § 8 (b)(1)(A) which provides:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . . ." 61 Stat. 141, 29 U. S. C. § 158 (b)(1)(A).

There was much conflict in the testimony as to what took place in connection with the picketing but those conflicts were resolved by the jury in favor of Russell.[3] Accepting a view of the evidence most favorable to him, the jury was entitled to conclude that petitioners did, by mass picketing and threats of violence, prevent him from entering the plant and from engaging in his employment

---

[3] Among the instructions given to the jury were the following requested by petitioners:

"5. I charge you that unless you are reasonably satisfied from the evidence in this case that the proximate cause of [respondent's] inability to work at the Decatur plant of Calumet and Hecla Consolidated Copper Company (Wolverine Tube Division) during the period from July 18, 1951 to August 22, 1951, was that a picket line was conducted by the [petitioners] in a manner which by force and violence, or threats of force and violence prevented [respondent] from entering the plant, and unless you are also reasonably satisfied from the evidence that work would have been available to [respondent] in the plant during said period, except for picketing in such manner, you should not return a verdict for the [respondent].

"6. I charge you that unless you are reasonably satisfied from the evidence that the acts complained of by [respondent] occurred, and that the [respondent] suffered a loss of wages as the natural and proximate result of said acts, you should return your verdict for the [petitioners]."

In its main charge to the jury, the trial court included the following statement:

"If, in this case, after considering all the evidence and under the instructions I have given you, you are reasonably satisfied that at the time complained of and in doing the acts charged, the [petitioners] . . . actuated by malice and actuated by ill-will, committed the unlawful and wrongful acts alleged, you, in addition to the actual damages, if any, may give damages for the sake of example and by way of punishing the [petitioners] or for the purpose of making the [petitioners] smart, not exceeding in all the amount claimed in the complaint.

"In order to authorize the fixing of such damages, you must be reasonably satisfied from the evidence that there was present willfulness or wantonness and a reckless disregard of the rights of the other person."

from July 18 to August 22.  The jury could have found
that work would have been available within the plant
if Russell, and others desiring entry, had not been ex-
cluded by the force, or threats of force, of the strikers.[4]

---

[4] On the evidence before it, the jury was entitled to find that about
400 of the employees who had attended union meetings on July 17
were in front of the plant gates at 8 o'clock the following morning.
A crowd of between 1,500 and 2,000 people, including the above 400,
was near the plant gates when the first shift was due to report for
work at 8 a. m.  Between 700 and 800 automobiles were parked along
the street which led to and ended at the plant.  A picket line of
25 to 30 strikers, carrying signs and walking about three feet apart,
moved in a circle extending completely across the street.  Adjacent
to the street at that point, there was a group of about 150 people,
some of whom changed places with those in the circle.  On the other
side of the street, there was another group of about 50 people.  Many
members of the first shift came, bringing their lunches, in expectation
of working that day as usual.  Russell was one of these and he tried
to reach the plant gates.  Because of the crowd, he proceeded slowly
to within 20 or 30 feet of the picket line.  There he felt a drag on
his car and stopped.  While thus stopped, the regional director of
the union came to him and said, "If you are salaried, you can go
on in.  If you are hourly, this is as far as you can go."  Russell
nevertheless edged toward the entrance until someone near the picket
line called out, "He's going to try to go through."  Another yelled,
"Looks like we're going to have to turn him over to get rid of him,"
and several yelled, "Turn him over."  No one actually attempted
to turn over Russell's car but the picket line effectively blocked his
further progress.  He remained there for more than an hour and a
half.  From time to time, he tried to ease his car forward but, when
he did so, the pickets would stop walking and turn their signs toward
his car, some of them touching the car.  When he became convinced
that he could not get through the picket line without running over
somebody or getting turned over, he went home.  The plant's offices
were open and salaried employees worked there throughout the strike.
Russell and other hourly employees necessary to operate the plant
were prevented from reaching the company gates in the manner
described.  During the next five weeks he kept in touch with the
unchanged situation at the plant entrance, and set about securing
signatures to a petition of enough employees, who wished to resume
work, to operate the plant.  After obtaining over 200 signatures, the

This leaves no significant issue of fact for decision here. The principal issue of law is whether the state court had jurisdiction to entertain Russell's amended complaint or whether that jurisdiction had been pre-empted by Congress and vested exclusively in the National Labor Relations Board.

At the outset, we note that the union's activity in this case clearly was not protected by federal law. Indeed the strike was conducted in such a manner that it could have been enjoined by Alabama courts. *Youngdahl* v. *Rainfair, Inc.,* 355 U. S. 131; *Auto Workers* v. *Wisconsin Board,* 351 U. S. 266.

In the *Laburnum* case, *supra,* the union, with intimidation and threats of violence, demanded recognition to which it was not entitled. In that manner, the union prevented the employer from using its regular employees and forced it to abandon a construction contract with a consequent loss of profits. The employer filed a tort action in a Virginia court and received a judgment for about $30,000

---

petition was presented to the company on or about August 18. On August 20, the company advertised in a local newspaper that on August 22 the plant would resume operations. All employees were requested to report to work at 8 a. m. on August 22. At that time, about 70 state highway patrol officers and 20 local police officers were at the gates and convoyed into the plant about 230 hourly paid employees reporting for work. Russell was among them and he was immediately put to work. Thereafter, he had no difficulty in entering the plant.

There also was evidence that on August 20 the company sought to run its switch engine out of the yard to bring in cars containing copper ingots. The engine, however, was met by strikers—some of whom stood in its path. One pulled out the engine's ignition key and threw it away. Others in the crowd cut the engine's fan belts, air hoses and spark plug wires, removed the distributor head and disabled the brakes. The engine was then rolled back into the plant yard by the crew without its mission having been accomplished. There is no evidence that Russell was present on this occasion.

compensatory damages, plus $100,000 punitive damages. On petition for certiorari, we upheld the state court's jurisdiction and affirmed its judgment. We assumed that the conduct of the union constituted a violation of § 8 (b)(1)(A) of the Federal Act. Nevertheless, we held that the Federal Act did not expressly or impliedly deprive the employer of its common-law right of action in tort for damages.

This case is similar to *Laburnum* in many respects. In each, a state court awarded compensatory and punitive damages against a union for conduct which was a tort and also assumed to be an unfair labor practice. The situations are comparable except that, in the instant case, the Board is authorized, under § 10 (c) of the Federal Act, to award back pay to employees under certain circumstances. We assume, for the purpose of argument, that the Board would have had authority to award back pay to Russell.[5] Petitioners assert that the possibility of partial relief distinguishes the instant case from *Laburnum*. It is our view that Congress has not made such a distinction and that it has not, in either case, deprived a victim of the

---

[5] The Board has held that it can award back pay where a union has wrongfully caused a termination in the employee status, but not in a case such as this when a union merely interferes with access to work by one who remains at all times an employee. *In re United Furniture Workers of America, CIO,* 84 N. L. R. B. 563, 565. That view was acknowledged in *Progressive Mine Workers* v. *Labor Board,* 187 F. 2d 298, 306–307, and has been adhered to by the Board in subsequent cases. *E. g., Local 983,* 115 N. L. R. B. 1123. Petitioners contend that the Board's above interpretation of its own power conflicts with the rationale of *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, and *Virginia Electric Co.* v. *Labor Board,* 319 U. S. 533. See also, *In re United Mine Workers,* 92 N. L. R. B. 916, 920 (dissenting opinion); *United Electrical, Radio and Machine Workers,* 95 N. L. R. B. 391, 392, n. 3. As the decision of this question is not essential in the instant case, we do not pass upon it.

kind of conduct here involved of common-law rights of action for all damages suffered.

Section 10 (c) of the Federal Act, upon which petitioners must rely, gives limited authority to the Board to award back pay to employees. The material provisions are the following:

> "If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act: *Provided,* That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him . . . ." 61 Stat. 147, 29 U. S. C. § 160 (c).

If an award of damages by a state court for conduct such as is involved in the present case is not otherwise prohibited by the Federal Acts, it certainly is not prohibited by the provisions of § 10 (c). This section is far from being an express grant of exclusive jurisdiction superseding common-law actions, by either an employer or an employee, to recover damages caused by the tortious conduct of a union. To make an award, the Board must first be convinced that the award would "effectuate the policies" of the Act. "The remedy of back pay, it must be remembered, is entrusted to the Board's discretion; it is not mechanically compelled by the Act." *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 198. The power to order affirmative relief under

§ 10 (c) is merely incidental to the primary purpose of Congress to stop and to prevent unfair labor practices. Congress did not establish a general scheme authorizing the Board to award full compensatory damages for injuries caused by wrongful conduct. *United Workers* v. *Laburnum Corp.*, 347 U. S. 656, 666–667. In *Virginia Electric Co.* v. *Labor Board,* 319 U. S. 533, 543, in speaking of the Board's power to grant affirmative relief, we said:

> "The instant reimbursement order [which directs reimbursement by an employer of dues checked off for a dominated union] is not a redress for a private wrong. Like a back pay order, it does restore to the employees in some measure what was taken from them because of the Company's unfair labor practices. In this, both these types of monetary awards somewhat resemble compensation for private injury, but it must be constantly remembered that both are remedies created by statute—the one explicitly and the other implicitly in the concept of effectuation of the policies of the Act—which are designed to aid in achieving the elimination of industrial conflict. They vindicate public, not private, rights. Cf. *Agwilines, Inc.* v. *Labor Board,* 87 F. 2d 146, 150–51; *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177. For this reason it is erroneous to characterize this reimbursement order as penal or as the adjudication of a mass tort. It is equally wrong to fetter the Board's discretion by compelling it to observe conventional common law or chancery principles in fashioning such an order, or to force it to inquire into the amount of damages actually sustained. Whether and to what extent such matters should be considered is a complex problem for the Board to decide in the light of its administrative experience and knowledge."

In *Laburnum,* in distinguishing *Garner* v. *Teamsters Union,* 346 U. S. 485, we said:

> "To the extent that Congress prescribed preventive procedure against unfair labor practices, that case recognized that the Act excluded conflicting state procedure to the same end. To the extent, however, that Congress has not prescribed procedure for dealing with the consequences of tortious conduct already committed, there is no ground for concluding that existing criminal penalties or liabilities for tortious conduct have been eliminated. The care we took in the *Garner* case to demonstrate the existing conflict between state and federal administrative remedies in that case was, itself, a recognition that if no conflict had existed, the state procedure would have survived." 347 U. S., at 665.

In this case there is a possibility that both the Board and the state courts have jurisdiction to award lost pay. However, that possibility does not create the kind of "conflict" of remedies referred to in *Laburnum.* Our cases which hold that state jurisdiction is pre-empted are distinguishable. In them we have been concerned lest one forum would enjoin, as illegal, conduct which the other forum would find legal, or that the state courts would restrict the exercise of rights guaranteed by the Federal Acts.[6]

---

[6] See, *e. g., San Diego Council* v. *Garmon,* 353 U. S. 26 (involving state injunction of peaceful picketing) ; *Amalgamated Meat Cutters* v. *Fairlawn Meats, Inc.,* 353 U. S. 20, 23 (same) ; *United Mine Workers* v. *Arkansas Oak Flooring Co.,* 351 U. S. 62, 75 (same) ; *Garner* v. *Teamsters Union,* 346 U. S. 485, 498–500 (same) ; *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468, 475–476, 479–481 (involving state injunction of a strike and peaceful picketing) ; *Bus Employees* v. *Wisconsin Board,* 340 U. S. 383, 394–395, 398–399 (involving state statute restricting right to strike of, and compelling arbitration by, public utility employees) ; *Automobile Workers* v. *O'Brien,* 339 U. S. 454,

In the instant case, there would be no "conflict" even if one forum awarded back pay and the other did not. There is nothing inconsistent in holding that an employee may recover lost wages as damages in a tort action under state law, and also holding that the award of such damages is not necessary to effectuate the purposes of the Federal Act.

In order to effectuate the policies of the Act, Congress has allowed the Board, in its discretion, to award back pay. Such awards may incidentally provide some compensatory relief to victims of unfair labor practices. This does not mean that Congress necessarily intended this discretionary relief to constitute an exclusive pattern of money damages for private injuries. Nor do we think that the Alabama tort remedy, as applied in this case, altered rights and duties affirmatively established by Congress.

To the extent that a back-pay award may provide relief for victims of an unfair labor practice, it is a partial alternative to a suit in the state courts for loss of earnings. If the employee's common-law rights of action against a union tortfeasor are to be cut off, that would in effect grant to unions a substantial immunity from the consequences of mass picketing or coercion such as was employed during the strike in the present case.

The situation may be illustrated by supposing, in the instant case, that Russell's car had been turned over resulting in damage to the car and personal injury to him. Under state law presumably he could have recovered for

456–459 (involving state statute restricting right to strike by requiring, as a condition precedent, a strike vote resulting in an affirmative majority); *La Crosse Telephone Corp. v. Wisconsin Board,* 336 U. S. 18, 24–26 (involving state certification of the appropriate unit for collective bargaining); *Bethlehem Steel Co. v. New York Board,* 330 U. S. 767, 773–776 (same); *Hill v. Florida ex rel. Watson,* 325 U. S. 538, 541–543 (involving state statute restricting eligibility to be a labor representative).

medical expenses, pain and suffering and property damages. Such items of recovery are beyond the scope of present Board remedial orders. Following the reasoning adopted by us in the *Laburnum* case, we believe that state jurisdiction to award damages for these items is not pre-empted. Cf. *International Assn. of Machinists* v. *Gonzales, ante,* p. 617, decided this day. Nor can we see any difference, significant for present purposes, between tort damages to recover medical expenses and tort damages to recover lost wages. We conclude that an employee's right to recover, in the state courts, *all* damages caused him by this kind of tortious conduct cannot fairly be said to be pre-empted without a clearer declaration of congressional policy than we find here. Of course, Russell could not collect duplicate compensation for lost pay from the state courts and the Board.

Punitive damages constitute a well-settled form of relief under the law of Alabama when there is a willful and malicious wrong. *Penney* v. *Warren,* 217 Ala. 120, 115 So. 16. To the extent that such relief is penal in its nature, it is all the more clearly not granted to the Board by the Federal Acts. *Republic Steel Corp.* v. *Labor Board,* 311 U. S. 7, 10–12. The power to impose punitive sanctions is within the jurisdiction of the state courts but not within that of the Board. In *Laburnum* we approved a judgment that included $100,000 in punitive damages. For the exercise of the police power of a State over such a case as this, see also, *Youngdahl* v. *Rainfair, Inc.,* 355 U. S. 131; *Auto Workers* v. *Wisconsin Board,* 351 U. S. 266, 274, n. 12.

Accordingly, the judgment of the Supreme Court of Alabama is

*Affirmed.*

MR. JUSTICE BLACK took no part in the consideration or decision of this case.

Mr. Chief Justice Warren, with whom Mr. Justice Douglas joins, dissenting.

The issue in this case is whether the Taft-Hartley Act has pre-empted a State's power to assess compensatory and punitive damages against a union for denying a worker access to a plant during an economic strike—conduct that the Federal Act subjects to correction as an unfair labor practice under § 8 (b)(1)(A). If Congress had specifically provided that the States were without power to award damages under such circumstances, or if it had expressly sanctioned such redress in the state courts, our course of action would be clear. Because Congress did not in specific words make its will manifest, *International Union* v. *Wisconsin Employment Relations Board,* 336 U. S. 245, 252, we must be guided by what is consistent with the scheme of regulation that Congress has established.

It is clear from the legislative history of the Taft-Hartley Act that in subjecting certain conduct to regulation as an unfair labor practice Congress had no intention of impairing a State's traditional powers to punish or in some instances prevent that same conduct when it was offensive to what a leading case termed "such traditionally local matters as public safety and order and the use of streets and highways." *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740, 749. Both proponents and critics of the measure conceded that certain unfair labor practices would include acts "constituting violation of the law of the State," [1] "illegal under State law," [2] "punishable under State and local police law," [3] or acts of such nature that "the main remedy for such conditions is prosecution under State law and better local law enforce-

---

[1] 93 Cong. Rec. 4024.

[2] S. Rep. No. 105 on S. 1126, Supp. Views, 80th Cong., 1st Sess. 50.

[3] 93 Cong. Rec. 4019.

ment." [4]   It was this role of state law that the lawmakers referred to when they conceded that there would be "two remedies" [5] for a violent unfair labor practice. For example, when Senator Taft was explaining to the Senate the import of the § 8 (b)(1)(A) unfair labor practice, he responded in this manner to a suggestion that it would "result in duplication of some of the State laws":

> "I may say further that one of the arguments has suggested that in case this provision covered violence it duplicated State law. I wish to point out that the provisions agreed to by the committee covering unfair labor practices on the part of labor unions also might duplicate to some extent that State law. Secondary boycotts, jurisdictional strikes, and so forth, *may involve some violation of State law respecting violence which may be criminal,* and so to some extent the measure may be duplicating the remedy existing under State law. But that, in my opinion, is no valid argument." [6]   (Emphasis added.)

This frequent reference to a State's continuing power to prescribe criminal punishments for conduct defined as an unfair labor practice by the Federal Act is in sharp contrast to the absence of any reference to a State's power to award damages for that conduct.

In the absence of a reliable indication of congressional intent, the Court should be guided by principles that lead to a result consistent with the legislative will. It is clear that the States may not take action that fetters the exercise of rights protected by the Federal Act, *Hill* v. *Florida,* 325 U. S. 538, or constitutes a counterpart to its regulatory scheme, *International Union of United Automobile*

---

[4] 93 Cong. Rec. 4432.

[5] *E. g.,* 93 Cong. Rec. 4024.

[6] 93 Cong. Rec. 4437.

*Workers* v. *O'Brien,* 339 U. S. 454, or duplicates its remedies, *Garner* v. *Teamsters Union,* 346 U. S. 485. The Court must determine whether the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz,* 312 U. S. 52, 67. If the state action would frustrate the policies expressed or implied in the Federal Act, then it must fall. The state action here—a judgment requiring a certified bargaining representative to pay punitive and compensatory damages to a nonstriker who lost wages when striking union members denied him access to the plant—must be tested against that standard.

Petitioners do not deny the State's power to award damages against individuals or against a union for physical injuries inflicted in the course of conduct regulated under the Federal Act.[7] The majority's illustration involving facts of that sort is therefore beside the point. But the power to award damages for personal injuries does not necessarily imply a like power for other forms of monetary loss. The unprovoked infliction of personal injuries during a period of labor unrest is neither to be expected nor to be justified, but economic loss inevitably attends work stoppages. Furthermore, damages for personal injuries may be assessed without regard to the merits of the labor controversy, but in order to determine the cause and fix the responsibility for economic loss a court must consider the whole background and status of the dispute. As a consequence, precedents or examples involving personal injuries are inapposite when the problem is whether a state court may award damages for

---

[7] See *Hall* v. *Walters,* 226 S. C. 430, 85 S. E. 2d 729, cert. denied, 349 U. S. 953; *McDaniel* v. *Textile Workers,* 36 Tenn. App. 236, 254 S. W. 2d 1.

economic loss sustained from conduct regulated by the Federal Act.

The majority assumes for the purpose of argument that the Board had authority to compensate for the loss of wages involved here. If so, then the remedy the state court has afforded duplicates the remedy provided in the Federal Act and is subject to the objections voiced in my dissent in *International Association of Machinists* v. *Gonzales, ante,* p. 617, decided this day. But I find it unnecessary to rely upon any particular construction of the Board's remedial authority under § 10 (c) of the Act. In my view, this is a case in which the State is without power to assess damages whether or not like relief is available under the Federal Act. Even if we assume that the Board had no authority to award respondent back pay in the circumstances of this case, the existence of such a gap in the remedial scheme of federal legislation is no license for the States to fashion correctives. *Guss* v. *Utah Labor Relations Board,* 353 U. S. 1. The Federal Act represents an attempt to balance the competing interests of employee, union and management. By providing additional remedies the States may upset that balance as effectively as by frustrating or duplicating existing ones.

State-court damage awards such as those in the instant case should be reversed because of the impact they will have on the purposes and objectives of the Federal Act. The first objection is the want of uniformity this introduces into labor regulation. Unquestionably the Federal Act sought to create a uniform scheme of national labor regulation. By approving a state-court damage award for conduct regulated by the Taft-Hartley Act, the majority assures that the consequences of violating the Federal Act will vary from State to State with the availability and constituent elements of a given right of action

and the procedures and rules of evidence essential to its vindication. The matter of punitive damages is an example, though by no means the only one. Several States have outlawed or severely restricted such recoveries.[8] Those States where the recovery is still available entertain wide differences of opinion on the end sought to be served by the exaction and the conditions and terms on which it is to be imposed.[9]

The multitude of tribunals that take part in imposing damages also has an unfavorable effect upon the uniformity the Act sought to achieve. Especially is this so when the plaintiff is seeking punitive or other damages for which the measure of recovery is vague or nonexistent. Differing attitudes toward labor organizations will inevitably be given expression in verdicts returned by jurors in various localities. The provincialism this will engender in labor regulation is in direct opposition to the care Congress took in providing a single body of nationwide jurisdiction to administer its code of labor regulation. Because of these inescapable differences in the content and application of the various state laws, the majority's decision assures that the consequences of engaging in an unfair labor practice will vary from State to State. That is inconsistent with a basic purpose of the Federal Act.

---

[8] Louisiana, Massachusetts, Nebraska, and Washington allow no such recovery. Indiana forbids it when the conduct is also punishable criminally. Connecticut limits the recovery to the expenses of litigation. McCormick, Damages, § 78. Note, 70 Harv. L. Rev. 517.

[9] Some States regard the damages as extra compensation for injured feelings. In most jurisdictions the recovery is calculated to punish and deter rather than compensate, though some States permit the jury to consider the plaintiff's costs of litigation. In most state courts a principal must answer if the wrongful conduct was within the general scope of the agent's authority. This list of differences is not exhaustive. McCormick, §§ 78–85. Note, 70 Harv. L. Rev. 517.

The scant attention the majority pays to the large proportion of punitive damages in plaintiff's judgment [10] cannot disguise the serious problem posed by that recovery.[11]  The element of deterrence inherent in the imposition or availability of punitive damages for conduct that is an unfair labor practice ordinarily makes such a recovery repugnant to the Federal Act.  The prospect of such liability on the part of a union for the action of its members in the course of concerted activities will inevitably influence the conduct of labor disputes.  There is a very real prospect of staggering punitive damages accumulated through successive actions by parties injured by members who have succumbed to the emotion that frequently accompanies concerted activities during labor unrest. This threat could render even those activities protected by the Federal Act too risky to undertake.  Must we assume that the employer who resorts to a lockout is also subject to a succession of punitive recoveries at the hands of his employees?  By its deterrent effect the imposition or availability of punitive damages serves a regulatory purpose paralleling that of the Federal Act.  It is precisely such an influence on the sensitive area of labor

---

[10] Plaintiff's wages were approximately $100 per week and he was out of work five weeks.  Therefore, about $9,500 of his $10,000 verdict represents punitive damages and damages for "mental pain and anguish."

[11] *Republic Steel Corp.* v. *N. L. R. B.*, 311 U. S. 7, is not authority for the majority's holding on punitive damages.  That case held that the Board overstepped the remedial authority conferred by § 10 (c) of the Wagner Act when it required an employer to reimburse the Work Projects Administration for wages paid wrongfully discharged employees subsequently employed on WPA projects.  The Court said this payment was in the nature of a penalty and concluded that the Act conferred no authority on the Board to exact such a penalty.  There was no question of pre-emption and no discussion directed at whether an award of punitive damages by a *State* would be consistent with the Federal Act.

relations that the pre-emption doctrines are designed to avoid.

There are other vices in the punitive recovery. A principal purpose of the Wagner and Taft-Hartley Acts is to promote industrial peace.[12] Consistent with that aim Congress created tribunals, procedures and remedies calculated to bring labor disputes to a speedy conclusion. Because the availability of a state damage action discourages resort to the curative features of the pertinent federal labor law, it conflicts with the aims of that legislation. In a case such as the present one, for example, the plaintiff is unlikely to seek a cease-and-desist order, which would quickly terminate the § 8 (b)(1)(A) unfair labor practice, if he is assured compensatory damages and has the prospect of a lucrative punitive recovery as well.

In Alabama, as in many other jurisdictions, the theory of punitive damages is at variance with the curative aims of the Federal Act. The jury in this case was instructed that if it found that the defendant was "actuated by ill-will" it might award "smart money" (punitive damages) "for the purpose of making the defendant smart . . . ."[13] The parties to labor controversies have enough devices for making one another "smart" without this Court putting its stamp of approval upon another. I can conceive of nothing more disruptive of congenial labor relations than arming employee, union and management with the potential for "smarting" one another with exemplary damages. Even without the punitive element, a damage action has an unfavorable effect on the climate of labor relations. Each new step in the proceedings rekindles the animosity. Until final judgment the action is a constant source of friction between the parties. In the present case, for example, it has been

---

[12] 29 U. S. C. §§ 141, 151.

[13] R. 632.

nearly six years since the complaint was filed. The numerous other actions awaiting outcome of this case portend more years of bitterness before the courts can conclude what a Board cease-and-desist order might have settled in a week. As the dissent warned in *United Constr. Workers* v. *Laburnum Constr. Corp.*, 347 U. S. 656, 671, a state-court damage action for conduct that constitutes an unfair labor practice "drags on and on in the courts, keeping old wounds open, and robbing the administrative remedy of the healing effects it was intended to have."

The majority places its principal reliance upon *United Constr. Workers* v. *Laburnum Constr. Corp., supra.* I joined in that decision, but my understanding of the case differs from that of the majority here. That case was an action by an employer against a stranger union for damages for interference with contractual relations. While engaged in construction work on certain mining properties the plaintiff employer had used AFL laborers pursuant to its collective bargaining contract. A field representative of the United Construction Workers, an affiliate of the United Mine Workers, informed plaintiff's foreman that he was working in "Mine Workers territory," and demanded that his union be recognized as the sole bargaining agent for the employees. Otherwise, he threatened, the United Construction Workers would "close down" all of the work. At the time of this ultimatum not a single worker in Laburnum's employ belonged to the stranger union. Plaintiff refused. A few days later the union representative appeared at the job site with a "rough, boisterous crowd" variously estimated from 40 to 150 men. Some were drunk. Some carried guns and knives. Plaintiff's employees were informed that they would have to join the United Construction Workers or "we will kick you out of here." A few workers yielded to the mob. Those who refused were

subjected to a course of threats and intimidation until they were afraid to proceed with their work.  As a consequence, the employer was compelled to discontinue his work on the contract and it was lost.  The employer sued the United Construction Workers for the profits lost by this interference, recovering compensatory and punitive damages.[14]  This Court affirmed.

There are at least three crucial differences between this case and *Laburnum*.  *First*, in this case the plaintiff is seeking damages for an interference with his right to work during a strike.  Since the right to refrain from concerted activities is protected by § 7 of the Act, a § 8 (b)(1)(A) unfair labor practice is inherent in the wrong of which plaintiff complains, and the Federal Act offers machinery to correct it.  The § 8 (b)(1)(A) unfair labor practice in *Laburnum*, on the other hand, was involved only fortuitously.  Damages were awarded for interference with the contractual relationship between the employer and the parties for whom the construction work was being performed.  The means defendants chose to effect that interference happened to constitute an unfair labor practice, but the same tort might have been committed by a variety of means in no way offensive to the Federal Act.  *Laburnum* simply holds that a tortfeasor should not be allowed to immunize himself from liability for a wrong having no relation to federal law simply because the means he adopts to effect the wrong transgress a comprehensive code of federal regulation.  The availability of state-court damage relief may discourage the employer from invoking the remedies of the Federal Act on behalf of his employees.[15]

[14] 194 Va. 872, 75 S. E. 2d 694.

[15] It is clear that the employer in *Laburnum* could have invoked the investigative and preventive machinery of the Board.  An unfair labor practice charge may be filed by "any person."  29 CFR, 1955 Cum. Supp., § 102.9.  *Local Union No. 25* v. *New York, New Haven & H. R. Co.*, 350 U. S. 155, 160.

But that effect may be tolerated since the employer's interest is at most derivative, and there will be nothing to dissuade the employees, who are more directly concerned, from using the federal machinery to correct the interference with their protected activity.

*Second*, the defendant in this case is the certified bargaining agent of employees at the plant where plaintiff is employed, and the wrong involved was committed in the course of picketing incident to an economic strike to enforce wage demands. Thus, the controversy grows out of what might be called an ordinary labor dispute. Continued relations may be expected between the parties to this litigation. The defendant in *Laburnum,* on the other hand, was a total stranger to the employer's collective bargaining contract, and could claim the membership of not a single worker. There was no prospect of a continuing relationship between the parties to the suit, and no need for concern over the climate of labor relations that an action might impair. The defendant was attempting to coerce Laburnum's employees, either by direct threats or employer pressures, to join its ranks. Such predatory forays are disfavored when undertaken by peaceful picketing, and even more so when unions engage in the crude violence used in *Laburnum.*

*Finally,* the effect of punitive damages in cases such as the present one is entirely different from that which results from the recovery sanctioned in *Laburnum.* Since the wrong in *Laburnum* was committed against an employer, the damages exacted there were probably the extent of the defendant's liability for that particular conduct. Where it is employees who have been wronged, however, there may be dozens of actions for the same conduct, each with its own demand for punitive damages. In the instant case, for example, Russell is only one of thirty employees who have filed suits against the union for the same conduct, all of them claiming sub-

stantial punitive damages.[16] Whatever the law in other States, Alabama seems to hold to the view that evidence of a previous punitive recovery is inadmissible as a defense in a subsequent action claiming punitive damages for the

[16] Petitioner has supplied the Court with the following list of those cases. All are held in abeyance pending decision of the instant case. Unless otherwise noted each action is in the Circuit Court of Morgan County, Alabama. The amount shown is the total damages asked, which is composed of a relatively insubstantial loss-of-wages claim and a balance of punitive damages. Petitioners' Appendices, pp. 7a–9a.

1. *Burl McLemore* v. *United Automobile, Aircraft and Agricultural Implement Workers of America, AFL–CIO, et al.,* #6150, $50,000. Verdict and judgment of $8,000. New trial granted because of improper argument of plaintiff's counsel. 264 Ala. 538, 88 So. 2d 170.

2. *James W. Thompson* v. *Same,* #6151, $50,000. Appeal from $10,000 verdict and judgment pending in Supreme Court of Alabama.

3. *N. A. Palmer* v. *Same,* #6152, $50,000. Appeal from $18,450 verdict and judgment pending in Supreme Court of Alabama.

4. *Lloyd E. McAbee* v. *Same,* #6153, $50,000.

5. *Tommie F. Breeding* v. *Same,* #6154, $50,000.

6. *David G. Puckett* v. *Same,* #6155, $50,000.

7. *Comer T. Junkins* v. *Same,* #6156, $50,000.

8. *Joseph E. Richardson* v. *Same,* #6157, $50,000.

9. *Cois E. Woodard* v. *Same,* #6158, $50,000.

10. *Millard E. Green* v. *Same,* #6159, $50,000.

11. *James C. Hughes* v. *Same,* #6160, $50,000.

12. *James C. Dillehay* v. *Same,* #6161, $50,000. '

13. *James T. Kirby* v. *Same,* #6162, $50,000.

14. *Cloyce Frost* v. *Same,* #6163, $50,000.

15. *E. L. Thompson, Jr.* v. *Same,* #6164, $50,000.

16. *J. A. Glasscock, Jr.* v. *Same,* #6165, $50,000.

17. *Hoyt T. Penn* v. *Same,* #6166, $50,000.

18. *Spencer Weinman* v. *Same,* #6167, $50,000.

19. *Joseph J. Hightower* v. *Same,* #6168, $50,000.

20. *A. A. Kilpatrick* v. *Same,* #6169, $50,000.

21. *Charles E. Kirk* v. *Same,* #6170, $50,000.

22. *Richard W. Penn* v. *Same,* #6171, $50,000.

23. *Robert C. Russell* v. *Same,* #6172, $50,000.

same conduct.[17]  Thus, the defendant union may be held for a whole series of punitive as well as compensatory recoveries.  The damages claimed in the pending actions total $1,500,000, and to the prospect of liability for a fraction of that amount may be added the certainty of large legal expenses entailed in defending the suits.  By reason of vicarious liability for its members' ill-advised conduct on the picket lines, the union is to be subjected to a series of judgments that may and probably will reduce it to bankruptcy, or at the very least deprive it of the means necessary to perform its role as bargaining agent of the employees it represents.  To approve that risk is to exact a result *Laburnum* does not require.

---

24. *T. H. Abercrombie* v. *Same,* #6173, $50,000.

25. *James H. Tanner* v. *Same,* #6174, $50,000.

26. *Charles E. Carroll* v. *Same,* #6175, $50,000.

27. *Ordell T. Garvey* v. *Same,* #6176, $50,000.

28. *A. R. Barran* v. *Same,* #6177, $50,000.

29. *Russell L. Woodard* v. *Same,* #6178, $50,000.

[17] *Alabama Power Co.* v. *Goodwin,* 210 Ala. 657, 99 So. 158.  That was an action by a passenger against a streetcar company for injuries sustained in a collision.  As a defense to a count for punitive damages, the defendant sought to show that punitive damages had already been awarded against it in another suit growing out of the same collision. The court held that the evidence was properly excluded, for "in its civil aspects the single act or omission forms as many distinct and unrelated wrongs as there are individuals injured by it."  210 Ala., at 658–659, 99 So., at 160.  While conceding the logical relevancy of a previous recovery, the court felt that the rule of exclusion was the better rule since it would prevent the introduction of such collateral issues as whether and to what extent punitive damages had been included in a previous verdict.  This rule of exclusion was applied in *Southern R. Co.* v. *Sherrill,* 232 Ala. 184, 167 So. 731. Cf. McCormick, Damages, § 82, and 2 Sutherland, Damages (4th ed. 1916), § 402, discussing the majority rule that evidence of prior criminal punishment is inadmissible in an action for punitive damages for the same misfeasance.

From the foregoing I conclude that the *Laburnum* case, to which the majority attributes such extravagant proportions, is not controlling here. In my judgment, the effect of allowing the state courts to award compensation and fix penalties for this and similar conduct will upset the pattern of rights and remedies established by Congress and will frustrate the very policies the Federal Act seeks to implement. The prospect of that result impels me to dissent.