JOSEPH BLUM, PLAINTIFF-RESPONDENT, v. INTERNA-TIONAL ASSOCIATION OF MACHINISTS, AFL-CIO AND CHARLES E. BEYER AND WARREN O. HOFFMAN, IN-DIVIDUALLY AND AS MEMBERS OF THE "I. A. M. COMMITTEE AND OXWALL PRODUCTS," DEFENDANTS-APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued April 8, 1963—Supplemental legal memoranda May 28, 1963—Decided July 3, 1963.

Before Judges GOLDMANN, FREUND and FOLEY.

*Mr. Thomas L. Parsonnet* argued the cause for appellants (*Messrs. Parsonnet & Parsonnet,* attorneys).

*Mr. Wilbur M. Rush* argued the cause for respondent (*Mr. Robert L. Schumann,* on the brief).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D.    Defendants, by leave of court granted, appeal from a Superior Court, Law Division, order denying their motion for summary judgment upon their fourth separate defense setting up federal pre-emption of the issues involved, and granting plaintiff's motion to strike that defense.

Plaintiff Blum, plant manager of Oxwall Products Company, Inc., instituted the present action to recover damages for alleged libelous material contained in certain leaflets pub-

lished and issued by defendants under the name "Union News." Toward the end of November 1960 defendant union and its representatives launched a campaign for the purpose of organizing Oxwall's production and maintenance employees and eventually winning an election to be conducted by the National Labor Relations Board (NLRB). The campaign was conducted with vigor and persistence, and it was in the course of that campaign that defendants issued the printed sheets in question.

Oxwall is a manufacturing company located in Oxford, N. J., and engaged in interstate commerce within the meaning of the National Labor Relations Act, 29 *U. S. C. A.* § 141 *et seq.* On May 26, 1961 NLRB issued a complaint against Oxwall and three associated companies upon charges filed by the union alleging violations of sections 8(a)(1) and (3) of the National Labor Relations Act, 29 *U. S. C. A.* § 158(a)(1) and (3), as amended. After a hearing and the coming in of the intermediate report and recommended order of the trial examiner, NLRB entered its decision and order on February 5, 1962 adopting his findings, conclusions and recommendations, except as modified by it. It found as a fact, as had the trial examiner, that Oxwall (mainly through plaintiff) had "interfered with, restrained, and coerced its employees in violation of Section 8(a)(1) of the Act, by engaging in unlawful interrogation and threats of economic reprisal against its employees if they joined or assisted the Union." It also found that the company had accelerated the transfer of its assembling and shipping operations from the State of New Jersey to New York City "because of the union activities of its employees and its manifest union animus." Oxwall had scheduled the transfer for April 30, 1961, but moved the date forward to March 31, 1961. NLRB stated that it was apparent that the impetus for this precipitant move arose, not from any economic need, but from the fact that on March 15, 1961 the union had advised the company that it represented a majority of its employees and requested recognition and bargaining, and the further fact that shortly thereafter NLRB's regional

office had advised the company that the union had petitioned for an election. Accordingly, the Board found that by accelerating the transfer to New York City and by discharging almost all of its shipping employees, Oxwall had engaged in unlawful discriminatory conduct in violation of section 8(a)(3) and (1) of the act.

Plaintiff instituted this action during the union's organizational and election campaign. He seeks both compensatory and punitive damages on each of the four counts of the complaint. It is not unreasonable to draw the inference that this step was taken as a possible deterring influence upon the union and its representatives, for plaintiff is acting treasurer of Oxwall and secretary of one of its associated companies.

Defendants answered the complaint, setting up the defenses of truth and privileged communication. To these there was later added the defense of fair comment. Defendants subsequently moved to amend their answer by adding a fourth separate defense alleging federal pre-emption of jurisdiction over the action, and a fifth separate defense stating that the cause was not justiciable because any judgment in plaintiff's favor would constitute a violation of the First Amendment as an illegal abridgement of free speech. We are concerned only with the fourth defense, which reads:

"The issues herein involved concern a labor dispute between a labor organization and an employer, in which the plaintiff is a managing executive and which employer is engaged in interstate commerce under the terms of the Federal Labor-Management Relations Act as amended. The acts complained of in the Complaint and its Amendments are part and parcel of that labor dispute and the entire action is, by reason of the aforesaid Act of Congress, pre-empted to the proper federal jurisdiction and authority. Such pre-emption is exclusive and therefore this Court has no jurisdiction in this cause at all."

The trial judge granted the motion, but gave plaintiff leave to move to strike.

Plaintiff thereupon moved to strike the fourth separate defense. Defendants concurrently moved for summary judg-

ment upon that defense. The trial judge having granted plaintiff's motion, and denied defendants', the latter then sought and were granted leave to appeal.

The single issue presented is the legal question of whether Congress, by the adoption of the National Labor Relations Act and the Taft-Hartley Law (the Labor Management Relations Act of 1947, as amended by the Landrum-Griffin Act of 1959), 29 *U. S. C. A.* § 141 *et seq.*, pre-empted jurisdiction of a defamation action stemming from a union's conduct of a campaign to organize and win an NLRB election.

We are, of course, not concerned here with an action involving a violation of a labor-management contract in an industry affecting interstate commerce. Whatever may have been said by the United States Supreme Court in *San Diego Building Trades Council v. Garmon*, 359 *U. S.* 236, 79 *S. Ct.* 773, 3 *L. Ed.* 2d 775 (1959), (*Garmon II*), and cases preceding it, concerning federal pre-emption of jurisdiction in such a situation, the matter was laid to rest in *Smith v. Evening News Ass'n*, 371 *U. S.* 195, 83 *S. Ct.* 267, 9 *L. Ed.* 2d 246 (1962). That case held that a common-law action for damages for breach of a collective bargaining contract between a labor organization and an employer in an industry affecting interstate commerce could be maintained against the employer in a state court by an employee who was a member of the labor group, and this even when the conduct complained of was concededly also an unfair labor practice within the jurisdiction of NLRB. The federal Supreme Court read section 301(a) of the Labor Management Relations Act, 29 *U. S. C. A.* § 185(a), as permitting state courts to have the concurrent jurisdiction with federal courts to grant damages in a breach of contract action of the type described, provided they enforced federal and not state law. The *Evening News* case was preceded by *Local 174, Teamsters, etc. v. Lucas Flour Co.*, 369 *U. S.* 95, 82 *S. Ct.* 571, 7 *L. Ed.* 2d 593 (1962), and *Charles Dowd Box Co., Inc. v. Courtney*, 368 *U. S.* 502, 82 *S. Ct.* 519, 7 *L. Ed.* 2d 483 (1962). Our highest court only recently had occasion to

follow *Evening News* in *Carpenters & Millwrights Local Union, etc. v. Riggs-Distler & Co.*, 40 *N. J.* 97 (1963) ; and see *Donnelly v. United Fruit Co.*, 40 *N. J.* 61, 76 *et seq.* (1963).

A further exception to the pre-emption rule may be found in cases involving threats of violence and violence itself. In such a situation resort may be had to a state court to prevent and to grant damages for acts of that character.

The pre-emption doctrine was most clearly projected in *Garner v. Teamsters, etc., Local Union,* 346 *U. S.* 485, 74 *S. Ct.* 161, 98 *L. Ed.* 228 (1953), and in *Garmon II*, above. *Garner* was an action seeking an injunction against picketing for recognition and a union shop, a violation of the Pennsylvania statutes. Mr. Justice Jackson, after first making it clear by reference to recent cases that the states retain the right to exercise their police power to prevent violence, held specifically that with respect to interstate commerce there had been a pre-emption of the whole field of labor relations, except where preservation of the peace was involved. He said:

"Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal [NLRB] and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies. * * * A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. The same reasoning which prohibits federal courts from intervening in such cases, except by way of review or on application of the federal Board, precludes state courts from doing so. * * * And the reasons for excluding state administrative bodies from assuming control of matters expressly placed within the competence of the federal Board also exclude state courts from like action. * * *" (346 *U. S.*, at *pages* 490–491, 74 *S. Ct.*, at *pages* 165–166, 98 *L. Ed.* 228)

Addressing himself to the argument that state court action was necessary to protect private rights, while the Labor Management Relations Act was intended to protect public rights, Justice Jackson said:

"Further, even if we were to assume, with petitioners, that distinctly private rights were enforced by the state authorities, it does not follow that the state and federal authorities may supplement each other in cases of this type. The conflict lies in remedies, not rights. The same picketing may injure both public and private rights. But when two separate remedies are brought to bear on the same activity, a conflict is imminent. * * *

* * * * * * * *

We conclude that when federal power constitutionally is exerted for the protection of public or private interests, or both, it becomes the supreme law of the land and cannot be curtailed, circumvented or extended by a state procedure merely because it will apply some doctrine of private right. To the extent that the private right may conflict with the public one, the former is superseded. To the extent that public interest is found to require official enforcement instead of private initiative, the latter will ordinarily be excluded. Of course, Congress, in enacting such legislation as we have here, can save alternative or supplemental state remedies by express terms, or by some clear implication, if it sees fit." (346 *U. S.*, at *pages* 498 and 500–501, 74 *S. Ct.*, at *pages* 169–170 and 171, 98 *L. Ed.* 228)

Thus, in *Garner,* state courts were permitted to enjoin violence, but otherwise they could not interfere with an industrial dispute by injunction. In *United Construction Workers v. Laburnum Construction Corp.,* 347 *U. S.* 656, 74 *S. Ct.* 833, 98 *L. Ed.* 1025 (1954), the company brought a common-law tort action in a state court against three labor organizations, seeking compensatory and punitive damages based upon tortious conduct which also constituted an unfair labor practice under section 8(b)(1)(A) of the Labor Management Relations Act, 29 *U. S. C. A.* § 158(b)(1)(A). The court held that the federal act did not give NLRB such exclusive jurisdiction over the subject matter of the action as to preclude the state court from hearing and determining the issues. It is important to note, however, that the type of conduct involved in *Laburnum* was intimidation and threats of violence, and

the *Garner* case was distinguished on that basis. The court pointed out that a state may enjoin acts of violence or breaches of the peace. Actions for damages resulting from such acts were in the same category, and a person injured by breaches of the peace could seek damages in the state courts.

A similar result was reached in *International Union, United Automobile, etc., Workers v. Russell,* 356 *U. S.* 634, 78 *S. Ct.* 932, 2 *L. Ed. 2d* 1030 (1958), where a non-union employee in an industry affecting interstate commerce brought a common-law tort action in a state court against a labor union and its agent to recover compensatory and punitive damages for malicious interference with his occupation. He claimed that by mass picketing and threats of violence during a strike they had for over a month prevented him from entering the plant and working. The court assumed that such action also constituted an unfair labor practice under section 8(b)(1)(A) above, but held that the federal act did not give NLRB such exclusive jurisdiction over the subject matter as to preclude the state court from entertaining the action. But here, again, the action was for damages resulting from violence, intimidation and breaches of the peace. The case was decided on the basis of *Laburnum.*

*Garmon II* deserves somewhat more extended consideration, even though *Smith v. Evening News Ass'n,* above, held that the *Garmon* doctrine no longer stands in the way of the exercise of concurrent jurisdiction by state and federal courts over a cause of action alleging breach of an employer-union contract. The *Garmon* case arose out of peaceful picketing by unions of respondents' place of business, and their exertion of pressure on customers and suppliers in order to persuade them to stop dealing with respondents—all this to compel execution of a union shop contract. The trial court enjoined the unions from picketing and from using other pressures until one of them had been properly designated as a collective bargaining agent. It also awarded $1,000 damages for losses found to have been sustained. Meantime, the NLRB had declined jurisdiction of a representation proceeding instituted by the

unions, presumably because the amount involved did not meet the Board's monetary standards in taking jurisdiction. On appeal from the trial court judgment, the California Supreme Court affirmed, holding that because of NLRB's declination the California courts had power over the dispute, and further deciding that the conduct of the unions constituted an unfair labor practice and was not privileged under California law.

The United States Supreme Court granted *certiorari*, vacated the injunction because of federal pre-emption, but remanded the matter for further proceedings and a determination below as to whether state or federal law applied to the demand for damages. On remand the California court set aside the injunction but sustained the award of damages, holding that the action of the unions constituted a tort based on an unfair labor practice under state law. The United States Supreme Court again granted *certiorari* and again reversed, holding that the action for damages was also pre-empted.

*Garmon II* was thus the first case to rule directly on federal pre-emption of an action for damages not arising from violence or a breach of the peace. Mr. Justice Frankfurter, writing for the majority, set at rest completely the argument that an action for damages, in the circumstances presented, differed from an action for an injunction; both such actions could with equal effectiveness hamper the regulation of industrial relations by the Federal Government. He quoted with approval the language in *Garner*, reproduced above, that Congress had not merely laid down a substantive rule of law to be enforced by any competent tribunal, but had expressed its intention that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.

Justice Frankfurter then went on to say, in language which has served as a key to the resolution of many cases which have arisen since *Garmon II,* that

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act [29 *U. S. C. A.*, § 157], or constitute an unfair labor practice under § 8 [29 *U. S. C. A.* § 158], due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law." (359 *U. S.*, at *page* 244, 79 *S. Ct.*, at *page* 779, 3 *L. Ed. 2d* 775)

Further,

"* * * When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." (359 *U. S.*, at *page* 245, 79 *S. Ct.*, at *pages* 779–780, 3 *L. Ed. 2d* 775)

Noting that *Garmon II* involved both tort law of general application and specialized labor relations statutes (359 *U. S., note 3*, at *page* 244, *79 S. Ct.*, at *page* 779, 3 *L. Ed. 2d* 775), Justice Frankfurter concluded with the following:

"Nor is it significant that California asserted its power to give damages rather than to enjoin what the Board may restrain though it could not compensate. Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered. Such regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy. Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme. See Garner v. Teamsters C. & H. Local Union, 346 U. S. 485, 492–497, 74 S. Ct. 161, 98 L. Ed. 228, 240–243. It may be that an award of damages in a particular situation will not, in fact, conflict with the active assertion of federal authority. The same may be true of the incidence of a particular state injunction. To sanction either involves a conflict with federal policy in that it involves allowing two law-making sources to govern. In fact, since remedies form an ingredient of any integrated scheme of regulation, to allow the State to grant a remedy here which has been withheld from the National Labor Relations Board only accentuates the danger of conflict.

It is true that we have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. United Auto. Workers v Russell, 356 U. S. 634, 78 S. Ct. 932, 2 L. Ed. 2d 1030; United Constr. Workers v Laburnum Corp. 347 U. S. 656, 74 S. Ct. 833, 98 L. Ed. 1025. We have also allowed the States to enjoin such conduct. Youngdahl v Rainfair, 355 U. S. 131, 78 S. Ct. 206, 2 L. Ed. 2d 151; United Auto. A. & A. I. W. v Wisconsin Employment Relations Board, 351 U. S. 266, 76 S. Ct. 794, 100 L. Ed. 1162. State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not over-ridden in the absence of clearly expressed congressional direction. We recognize that the opinion in United Constr. Workers v Laburnum Corp., 347 U. S. 656, 74 S. Ct. 833, 98 L. Ed. 1025, found support in the fact that the state remedy had no federal counterpart. But that decision was determined, as is demonstrated by the question to which review was restricted, by the 'type of conduct' involved, i. e., 'intimidation and threats of violence.'[6] In the present case there is no such compelling state interest." (359 *U. S.*, at *pages* 246–248, 79 *S. Ct.*, at *pages* 780–782, 3 *L. Ed.* 2d 775)

In footnote 6 of his opinion, Justice Frankfurter clearly distinguished between cases of non-violent tort and the violence or threats of violence which characterized the conduct involved in the *Laburnum* and *Russell* cases. He noted that throughout the *Laburnum* opinion "the court makes it clear that the holding in favor of state jurisdiction was limited to a situation involving violence and threats of violence." The decision in *Laburnum* "rested on the nature of the activities there involved, and the interest of the State in regulating them," and the case had so been interpreted in *Russell*, as well as in *Weber v. Anheuser-Busch, Inc.*, 348 *U. S.* 468, 75 *S. Ct.* 480, 99 *L. Ed.* 546 (1955).

In holding that there was no pre-emption in this case the trial judge quoted Mr. Justice Harlan in *Garmon II*. However, the quotation is taken from a concurring opinion joined in by only four members of the court. The *Garmon II* doctrine still stands unmodified as regards federal pre-emption of jurisdiction over tort actions seeking damages arising from non-violent conduct.

The present action seeking damages for libel is certainly "arguably" subject to § 7 or § 8 of the federal act, 29 *U. S. C. A.* §§ 157 and 158, and falls squarely within the *Garmon II* doctrine.

Section 8(c) of the Labor Management Relations Act, 29 *U. S. C. A.* § 158(c), provides that

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."

The purpose of this section is stated in *Senate Report No.* 105 on *Senate Bill* 1126, dated April 17, 1947, in which the Senate Committee said:

"Section 8(c): Another amendment to this section would insure both to employers and labor organizations full freedom to express their views to employees on labor matters, refrain from threats of violence, intimation of economic reprisal, or offers of benefit."

In short, it was the intent of Congress to permit full latitude for the discussion of labor problems on both sides, without fear of legal hindrance, as long as the exercise of free speech was not attended by threats of reprisal, force or promise of benefit.

The publication and distribution by defendants of the "Union News" leaflets occurred, as we have already noted, in the course of an organizing campaign looking to the election and recognition of the International Association of Machinists, AFL-CIO, as representative of Oxwall's employees. NLRB has on many occasions dealt with the limits to which parties to an election may go. In *Gummed Products*, 36 *LRRM* 1157 (1955), the Board said

"Exaggerations, inaccuracies, partial truths, name calling and falsehoods, while not condoned, may be excused as legitimate propaganda provided they are not so misleading as to prevent the exercise of a free choice by employees in the election of their bargaining representative."

And in the more recent case of *Sewell Mfg. Co.*, 138 *NLRB No.* 12 (August 9, 1962), the Board stated that it

"not only, conducts elections, but it also oversees the propaganda activities of the participants in the election to insure that the voters have the opportunity of exercising a reasoned, untrammeled choice for or against labor organizations seeking representation rights. The Board has said in election proceedings it seeks to provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees [*General Shoe*, 21 *LRRM* 1337 (1948)]. Where for any reason the standard falls too low the Board will set aside the election and direct a new one. Unsatisfactory conditions for holding elections may be created by promises of benefits, threats of economic reprisals, deliberate misrepresentations of material facts by an employer or a union, deceptive campaign tactics by a union, or by a general atmosphere of fear and confusion caused by a participant or by members of the general public. Standards, particularly those of permissive propaganda, are not fixed and immutable. They have been changed and refined, generally in the direction of higher standards."

As defendant points out, in this case NLRB would be required, or could be required in an appropriate case, to make findings as to whether defendants' statements were truthful, whether they contained threats of reprisal or promises of benefits such as are prohibited by law, and whether what the leaflets contained fell so far below the standard of permissive propaganda as to require Board action. NLRB might find defendants' contentions and factual proof truthful. On the other hand, a local jury might find just the opposite, and in doing so hold defendants liable in damages for the very acts which NLRB would hold, or already had held, to be lawful and proper. This would be completely contrary to the clear purpose of the federal act, which is to leave the effectuation of federal policy, except in a very limited number of situations, exclusively in the hands of NLRB.

The result we reach accords with the decision in *Hill v. Moe*, 367 *P. 2d* 739 (*Alaska Sup. Ct.* 1961). Appellants owned and operated a retail grocery store and meat market. The employees of the grocery department, members of the

Retail Clerks Union, went on strike and began to picket the premises in order to coerce the employer to enter into a contract with the union covering the meat department employees. The strike lasted about a week, and shortly thereafter the parties entered into a collective bargaining agreement which included the meat department personnel. Thereafter the employer sued for damages, alleging that the union's activities had been unlawful and that as a result of the picketing and for more than a year thereafter customers refused to trade at the store, causing damage to the business in excess of $100,000. The employer sought an additional $100,000 by reason of purported defamatory publications the union had made in a local newspaper. After hearing the employer's evidence, the trial court granted the union's motion for involuntary dismissal on the ground of lack of jurisdiction. The Alaska Supreme Court affirmed on appeal, holding that jurisdiction had been federally pre-empted. The court observed:

"If this were a case marked by violence, intimidation, or imminent threats to public order, then the state courts would be permitted to grant compensation for the consequences as defined by the law of torts. [Citing *Garmon II* and the *Russell* case, above, in a footnote.] But the trial court determined that the picketing did not involve those elements of injurious conduct, and we find that the evidence supports such determination. Hence, this area for the exercise of state jurisdiction was not open to the employer."

Accordingly, the order under review is reversed and the matter remanded for the entry of summary judgment in defendants' favor on the basis of the fourth separate defense.