EADS COAL COMPANY *et al.*, Plaintiffs-Appellees, *v.* UNITED MINE WORKERS OF AMERICA, DISTRICT 12 *et al.*, Defendants-Appellants.

(No. 74-97;

Fifth District—April 14, 1975.

Frederick P. Velde, of Heyl, Royster, Voelker, & Allen, of Springfield, and Thomas Gumbel, of Cohn, Carr, Korein, Kunin, & Brennan, of East St. Louis, for appellants.

G. W. Horsley, of Horsley, Kimble, Lott and Surman, of Springfield, and Howard W. Campbell, of Craig & Craig, of Mt. Vernon, for appellees.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

The defendants, United Mine Workers of America, District 12, hereinafter referred to as United, appeal from an order of the Circuit Court of Jefferson County modifying and making permanent a temporary injunction restraining violent conduct by members of United and limiting the number of pickets at the entrances of the plaintiff's Belle Rive Mine located near Mount Vernon, Illinois. We affirmed the issuance of the temporary injunction in *Eads Coal Co. v. UMW, District 12*, 131 Ill.App. 2d 1082, 269 N.E.2d 359.

Two principal issues are present in this appeal. First, was the labor dispute at the mine in whole or part preempted by Federal law at the time the temporary injunction was made permanent? Second, did the trial court err in making the temporary injunction permanent?

The issuance of the permanent injunction concerned events which occurred at plaintiff's mine in 1970 and 1971. Arch Mineral Corporation owned and operated the Belle Rive Mine. On February 20, 1970, the corporation entered into a contract with plaintiff Progressive Mine Workers of America, hereinafter referred to as Progressive, for operation of the mine. The corporation then joined the Coal Producers' Association of Illinois which had a master contract with Progressive and became bound by the terms of the contract. Later, Arch formed Eads as a wholly owned subsidiary and turned the mine over to the new corporation, which then became a member of the Coal Producers Association.

Eads recognized Progressive as the exclusive bargaining agent for the mine employees. United wanted to organize the employees at the Belle Rive Mine and attempted to persuade the employees to join United. During the week of October 12, 1970, operations at the mine were interrupted by mass picketing, acts of violence, threats to employees and other acts of intimidation and harassment at the mine and other places. A temporary injunction was granted ex parte on October 16 and was extended an additional 10 days on October 26. A motion to dissolve the injunction was denied on the same date. Following a hearing in which all the parties to the present appeal were represented and after extensive testimony was taken, a temporary injunction was granted on November 4, 1970. We affirmed. *Eads Coal Co. v. UMW, District 12.*

There were no further incidents until after the contract between United and Illinois Coal Operators Association expired on September 30, 1971. Thereafter, all coal miners belonging to United in Southern Illinois went out on strike. Those mines under contract with Progressive continued to operate. Picketing by members of United on October 22 and 23 caused Eads to close the Belle Rive Mine for 16 days. The plaintiffs filed a petition to show cause in which they alleged that in addition to the mass picketing, members of United threatened and intimidated employees of Eads, in violation of the temporary injunction. United subsequently signed a new contract in November, strike activities ceased, and plaintiffs did not pursue their petition. There were no allegations of further unlawful activities between October 1971 and the present time.

On February 14, 1973, the defendants filed a motion to dissolve the temporary injunction. The plaintiffs filed an answer and objections to the defendant's motion and moved that defendants' motion be denied and that the temporary injunction be made permanent. The plaintiffs filed

a motion to allow the introduction of testimony taken pursuant to the issuance of the 1970 order. After a hearing, the motion was granted. The court also ordered that any additional evidence relating to the 1970 order and subsequent events would also be heard at a hearing on the parties' motions. The hearing was held on July 23 and 24.

The testimony taken at the hearing relating to events in 1971 revealed that peaceful picketing by members of the defendant union caused the mine to shut down. There was no violence, intimidation or threats.

The first witness called by the plaintiff was Gene Mitchell, an international executive board member of the United Mine Workers of America. Counsel for plaintiff attempted to qualify him as a hostile witness under section 60 of the Civil Practice Act (Ill. Rev. Stat., ch. 110, par. 60,) because in 1971 he was an official of a subdistrict of District # 12 of United. Counsel for defendant objected that at the time of the incidents in 1971, he was not an agent of District 12. The trial court overruled the objection. Testimony was elicited concerning United's strike activities and the witness's acquaintances, but no testimony was elicited which linked United or Mitchell to activities at the Belle Rive Mine in October, 1971.

The next witness called was Jerry Sweat who had been president of Local 1513 in 1971. Counsel for plaintiff questioned him concerning a meeting of members of United held in Carrier Mills, Illinois, on October 21, 1971, to coordinate strike activities. Carrier Mills is 60 miles from Mount Vernon. At the time United was on strike throughout Illinois. The witness testified that Eads Coal Company was not mentioned at the meeting. The witness was then declared a hostile witness by the trial court after the following questions and answers:

"Q. And at that time was the Belle Rive Mine, Eads Mine, mentioned at that meeting?

A. Never.

Q. As being still working?

A. Never, never.

Q. I will ask you if you didn't say at that meeting this, or this in substance, that the Belle Rive Mine was still working and that you would send men there to stop the mine?

A. Mr. Horsley, you have a vivid imagination.

Q. You did not make that statement?

A. No, sir.

Q. Your Honor, I think the witness is showing his hostility.

*THE COURT:* Yes, he is now, I will permit you to call him and interrogate him as a hostile witness.

Q. Now, was that statement made at that meeting?

> *MR. GUMBEL:* Your Honor, I would like to make a statement for the record; there has been no adequate showing that this man is hostile.
>
> *THE COURT:* Let the record show the objection is overruled. Also let the record show the Court observes the demeanor of the witness. You may answer."

Nothing further of any relevance was then elicited from Sweat.

The next witness was Gene Grubaugh, the superintendent of the Belle Rive Mine in 1971. He testified that on the afternoon of October 22, 1971, about 20 or 30 men were lined up in front of the mine entrance and cars were strung out on either side of the road leading to the mine for a distance of about 300 yards. He said that when he left at 3 P.M. more than 100 men and 30 or 40 cars were present. That evening a train came to the mine to pull out some 45 or 50 cars of coal. Grubaugh testified over objection that the night foreman told him that the engineers had been persuaded by the pickets not to move out the coal. The next morning there were 30 men and 4 or 5 cars at the entrance. They dispersed early that morning. He testified that he did not work the next week because of "the fear," but admitted that he was not intimidated or threatened by anyone. The coal which had not been shipped the previous afternoon was moved out that afternoon. The employees of the mine did not return for 2 weeks. Grubaugh testified that the miners possibly did not come to work because they wished to honor the picket line present on October 22, and 23.

The next witness to testify was Gerald Beers, an employee at the mine. His hearsay testimony that the men at the mine on October 22 were members of United was admitted over objection. He said he talked to men and agreed to go into the mine, get his pay check and then leave. Beers said he was afraid, but said he was not threatened in any way and conceded during cross-examination that he might have merely honored the picket line. On re-direct he said it was due to fear, but on re-cross repeated that he had not been threatened in any way. Beryl Ford, who accompanied Beers to the mine on October 22, testified that the road to the mine entrance was 30 feet wide and that men congregating along it would have to stand in the road or else stand in a ditch.

Jim Hughes, an employee at Eads and son of the national president of Progressive, was then called. He said he did not work on October 22 because he was afraid, but admitted that he was not threatened. Furthermore, when accosted by the pickets at the mine entrance, he said he fearlessly refused to let the pickets keep him from entering the mine.

The above witnesses were asked over defendants' objections whether they were aware of alleged incidents of violence at the Sahara 20 coal

mine in Saline County. There was no testimony that employees were afraid to work because of those incidents. William Roberts, an employee of the company which operated the Sahara Mine, testified, over defense objection, that at the meeting at Carrier Mills on October 21, plans were discussed by Sweat and others to close down the Belle Rive Mine. Clarence Cooley, a clerk at the Sahara 21 Mine adjacent to Sahara 20, testified over defense objection to the events at Sahara 20. Sahara 20 is 60 miles from the Belle Rive Mine. There was no testimony that the miners who were allegedly involved in the incidents were present at the picket line at the Belle Rive Mine. Edgar Manley, an officer of Progressive in the area of the Sahara Mines and the Eads Mine, testified over defense objection about an anonymous telephone threat he received on October 19, 1971. He went to the Belle Rive Mine at about 4 P.M. on October 22 and 23 and did not observe any pickets. Dan Wild, an Eads employee, testified corroborating other witnesses' testimony as to events at the Belle Rive Mine on October 22. He said that the mine was shut down completely for one week and just a few people worked the next week. Full production resumed thereafter. Don Lowery, a miner employed at the Belle Rive Mine, testified that he did not cross the picket line because he did not want "any trouble."

Rex Camden, a foreman at the mine, testified over defense objections that the men picketing the mine on the night of October 22 had said they were members of United and asked the trainmen not to move the coal. James Phelps, a miner at the Belle Rive Mine, testified that he recognized two of the pickets as members of United. He said he smelled beer on the breath of one of the pickets. He stated that he did not return to work because he wanted to harvest a bean crop. Hubert Bradley, a miner employed at the Belle Rive Mine, confirmed the testimony of the other witnesses as to events at the Belle Rive Mine on October 22. He also said that the reason he did not work was not fear. Ray Edmison, another miner, testified he did not enter the mine because as a general matter he would not cross picket lines for fear of violence. Over defense objections, a list of license numbers taken by David Trotter, an Eads management employee and another man who did not testify, was admitted as being those of cars of the men who were at the mine entrance on October 22.

Eugene Hughes, national president of Progressive, testified over defense objection to what allegedly occurred at Sahara 20 and 21 and alleged personal harassment he experienced in October, 1971. On cross-examination, however, he said that he was not afraid of anyone. Tom Shoemake, an official of a subdistrict of District 12 of United, was, over defense objection, called as a hostile witness pursuant to section 60 of

the Civil Practice Act. He was asked whether he knew certain named individuals. He said he did not know most of them.

All of the above witnesses agreed that since the morning of October 23, 1971, there had been no pickets at the Belle Rive Mine. Furthermore, none of the witnesses testified that he had been threatened or in any way intimidated near or in connection with the events which occurred at the mine.

The first witness called by the defendant was Jerry Sweat. He stated that at no time had he directed any member of United to go to the Belle Rive Mine. John Wasson, a coal miner and member of United from Carrier Mills, was present at the meeting in Carrier Mills where William Roberts allegedly heard Jerry Sweat direct men to the Eads Mine. Wasson testified that he was present throughout the meeting in question. Defense counsel made an offer of proof, over plaintiffs' objection, that if allowed to testify further, Wasson would have said that Sweat did not tell anyone to go to the Belle Rive Mine. Robert Hill, a member of United from Carrier Mills, stated that he was present at the meeting in Carrier Mills on October 21. He said, over plaintiffs' objection, that he did not hear Sweat direct anybody to the Eads Mine. Steven Cummings, a member of United, testified that he attended the meeting in question. Defense counsel offered to prove Cummings would testify further that Sweat had not told anyone to go to the Belle Rive Mine. Tom Shoemake was allowed to testify about United's organizational goals over plaintiffs' objection because the trial court stated, "It is apparent from the record in this case that is what the fight is all about, I think." Shoemake stated he had approached miners at the Belle Rive Mine in an attempt to persuade them to join United. He further stated over plaintiffs' objection that the terms of the temporary injunction would make organization of the Belle Rive Mine almost impossible. He thought any attempt to approach individuals might be considered harassment. Defense counsel offered to prove that United's royalty for their pension fund was 70 cents a ton, whereas Progressive's was 20 cents a ton.

On December 22, 1973, the court issued a decree in favor of plaintiffs. The decree reaffirmed the findings in support of the issuance of the 1970 order. In addition, it stated that in October 1971 the defendants had engaged in mass picketing, had threatened the safety of the persons or property of the employees of Eads, and had planned and succeeded in shutting down the Belle Rive Mine. The decree found that the above acts had been proven by clear and convincing evidence, were performed in violation of the temporary injunction of November 4, 1970, that said acts transcended the prohibition of section 1 of "An Act relating to disputes concerning terms and conditions of employment" (Ill. Rev. Stat.

1971, ch. 48, par. 2a.) that plaintiffs had no adequate remedy at law, and that the plaintiffs had suffered and would continue to suffer irreparable damage unless the temporary injunction as modified was made permanent. The court therefore ordered that the defendants' motion to dissolve be denied and ordered that the defendants be permanently enjoined from performing the following acts:

"(a)  From intimidating, threatening, harassing or assaulting any persons entering or leaving the coal mine site belonging to the plaintiff Eads Coal Company south of Belle Rive, Illinois;

(b)  From intimidating, threatening, harassing or assaulting any employees of the plaintiff Eads Coal Company while on their way to and from said Belle Rive Coal Mine site;

(c)  From engaging in mass picketing of the Belle Rive Mine site or having at or near any single entrance to the mine premises, pickets in the excess of the total number of four pickets to each entrance of said mine;

(d)  From advising, encouraging, or assisting, or participating in the doing of any of the things which are herein forbidden;

(e)  From intimidating, threatening, harassing or promising physical violence anywhere, to either the person or the property of the plaintiff Eads Coal Company, including the making of any threats of violence or physical harm by the use of telephone, written communications, or other communication to their supervisory officials or employees of said plaintiff."

The above provisions are with a few notable exceptions identical to those contained in the 1970 injunction. The words "or otherwise interfering with" were deleted after "assaulting" in sections (a) and (b) of the permanent order. Section (d) of the earlier injunction set the allowable number of pickets at two per entrance. The latter order increased the number to four.

Proper consideration of the issues presented by this appeal requires that we precisely define the scope of our earlier decision, *Eads Coal Company v. UMW, District 12.* We held that the findings of the trial court that violence, threats and intimidation had occurred, were supported by the evidence and were not against the manifest weight of the evidence. Therefore, the Illinois Anti-Injunction Act was held inapplicable. At 131 Ill.App.2d 1082, 1084-1085, we stated:

"The question of which of the two unions has the right to represent the employees at Belle Rive Mine is not before this court. The state courts have jurisdiction to issue an injunction, if supported by the evidence, even though there is ultimate jurisdiction over the main issue before the National Labor Relations

Board. (*Precision Scientific Co. v. International Union of Mine, Mill and Smelter Workers* (1954), 2 Ill.App.2d 531, and *Fansteel Metallurgical Corporation v. Lodge 66 of Amalgamated Ass'n of Iron, Steel and Tin Workers of North America* (1938), 295 Ill. App.2d 323)."

The meaning of the first sentence is clear. The second was intended as a restatement of the rule that while State courts have no jurisdiction to pass on the merits of labor disputes arguably within the jurisdiction of the National Labor Relations Board, the interest of the States is so great where violence or threats of violence are involved, that State courts may regulate such conduct. (*San Diego Building Trades Council, Local 2020 v. Garmon*, 359 U.S. 236, 3 L.Ed.2d 775, 79 S.Ct. 773.) The injunction enjoined interference with the plaintiffs' activities and limited the number of allowable pickets; nevertheless, the question of whether our jurisdiction was in whole or in part preempted was not at issue. The issue before the court was simply whether the trial court properly issued a temporary injunction to terminate the defendants' acts of violence, threats and intimidation. The findings of the trial court compelled an answer in the affirmative.

The preemption question is an issue on this appeal. The permanent injunction was granted to restrain defendants' conduct in the course of a continuing jurisdictional labor dispute. In *Garmon* the United States Supreme Court delineated practical guidelines for application of the preemption doctrine:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. * * *

At times it has not been clear whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board. See, *e.g., Garner v. Teamsters*

*Union,* 346 U.S. 485, especially at 489-491; Weber v. Anheuser-Busch, Inc., 384 U.S. 468.

\* \* \* When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." 359 U.S. 236, 244-245, 3 L.Ed.2d 775, 783, 79 S.Ct. 773, 779-780.

■■■ In this case, it is at least arguable that the jurisdictional labor dispute at the Belle Rive Mine was governed by the provisions of section 7 and section 8 of the National Labor Relations Act (29 U.S.C. §§ 157, 158 (1970)). The permanent injunction, however, was directed toward restraining violence, threats, intimidation and picketing. To the extent that the decree sought to enjoin violence, threats and intimidation, it constituted an exception to the preemption doctrine and could have been granted under proper circumstances. To the extent that it prohibited picketing by a large number of defendants' members which made it difficult or impossible to enter or to leave plaintiffs' property, it was also an exception to the preemption doctrine. *San Diego Building Trades Council, Local 2020 v. Garmon; Amalgamated Association of Street, Electric Railway and Motor Coach Employees v. Lockridge,* 403 U.S. 274, 29 L.Ed.2d 473, 91 S.Ct. 1909; *UAW v. Russell,* 356 U.S. 634, 2 L.Ed.2d 1030, 78 S.Ct. 932; *Youngdahl v. Rainfair, Inc.,* 355 U.S. 131, 2 L.Ed.2d 151, 78 S.Ct. 206; *UAW v. Wisconsin Employment Relations Board,* 351 U.S. 266, 100 L.Ed. 1162, 76 S.Ct. 794; *United Construction Workers v. Laburnum Construction Corp.* 347 U.S. 656, 98 L.Ed. 1025, 74 S.Ct. 833. The permanent decree, however, went on to limit the number of pickets allowable at each entrance to the mine. While conduct involving violence and mass obstruction to plaintiffs' premises was within the court's power to proscribe, peaceful picketing not associated with an inevitably recurring pattern of violence may not be enjoined by a State court. (*Youngdahl v. Rainfair.*) The conduct initially enjoined ceased following the issuance of the temporary injunction in 1970. There was industrial peace until the fall of 1971 when picketing occurred at the mine. There were no further incidents at the mine. On these facts we cannot say an inevitably reappearing pattern of violence exists. The provision of the decree limiting the number of pickets to four per entrance must therefore be vacated.

The defendants advance several arguments in support of their contention that the other provisions of the decree must also be vacated. They argue first that their motion to dissolve should have been granted because between September 1971 and the date the permanent injunction

was granted, no further acts of violence or intimidation occurred. The underlying reasons for the temporary injunction having ceased to exist, the injunction should have failed as a matter of law. We note that in our first consideration of this case, we said that while the facts justified the issuance of a permanent injunction, the court's action in granting a temporary injunction was not an abuse of discretion. (*Eads Coal Co. v. UMW, District 12.* Permanent relief, however, was not sought at that time, nor after members of United picketed the mine in 1971. The passage of time and the fact that violence and intimidation did not reoccur, present us with a different case on this appeal.

The plaintiffs cite as controlling authority *Piano & Organ Workers' International Union of America v. Piano & Organ Supply Co.*, 124 Ill. App. 353. There members of the defendant union were found to have engaged in acts of violence, intimidation and mass picketing in September, 1903. The plaintiff procured a temporary injunction pending a final hearing, and all illegal activity ceased. The final hearing was held on December 22, 1903. A permanent injunction enjoining the illegal activities by the defendant was rendered June 28, 1904. The appellate court affirmed on the ground that the only activity permanently enjoined was illegal conduct. The rationale of *Piano and Organ Workers'* is inapplicable to the facts in the present case, since the injunction in that case was made permanent upon a final hearing held only three months after the illegal conduct occurred, and in the present case permanent relief was not sought for more than 2 years after the temporary relief was granted.

The right to injunctive relief rests on actual or presently threatened interference with another's rights, and such relief will not be granted on mere suspicion of an intended wrong. (21 I.L.P. *Injunctions* § 14 (1956)). In *Milk Wagon Drivers' Union v. Meadowmoor Dairies*, 312 U.S. 287, 85 L.Ed. 836, 61 S.Ct. 552, Mr. Justice Frankfurter discussed the effect of time on injunctions obtained to restrain violent union activities:

> "The injunction which we sustain is 'permanent' only for the temporary period for which it may last. It is justified only by the violence that induced it and only so long as it counteracts a continuing intimidation. Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted." (312 U.S. 298, 85 L.Ed. 844, 61 S.Ct. 552, 557.)

An injunction may be dissolved as to its prospective effect where a court finds that equity no longer justified its continuance, but the party seeking dissolution must make the necessary showing that he is entitled to such relief. (*Benson v. Isaacs*, 22 Ill.2d 606, 177 N.E.2d 209; *Flynn v. Kuchar-*

*ski*, 53 Ill.2d 88, 290 N.E.2d 1.) A court of equity will not grant an injunction to prevent in the future that which in good faith has been discontinued before the commencement of the action in the absence of evidence that the offense is likely to be repeated in the future. (*Walling v. T. Buettner & Co.* (7th Cir. 1943), 133 F.2d 306, *cert. denied*, 319 U.S. 771, 63 S.Ct. 1437, 87 L.Ed. 1719.) A delay in prosecution may constitute a ground for a motion to dissolve a temporary injunction unless a sufficient cause for the delay is presented. *Leonard v. Garland*, 252 Ill. 300, 96 N.E. 819.

■■ While ordinarily the continuance or dissolution of a temporary injunction rests in the discretion of the court (*Air-Tik Systems Inc. v. Lark Sales Co.*, 12 Ill.App.2d 304, 139 N.E.2d 308), and the court is vested with great discretion in deciding such matters (*Bernard Bros. v. Deibler*, 326 Ill.App. 538, 62 N.E.2d 248), the court must properly apply equitable rules and fairly weigh the facts in deciding whether the plaintiff is entitled to the extraordinary relief of an injunction. The unlawful conduct sought to be enjoined did not re-occur for more than 2 years. Although the plaintiffs might have sought permanent relief at any time after November 4, 1970, and could have done so conveniently in conjunction with their petition to show cause in 1971, the plaintiffs failed to take action until the defendants filed their motion to dissolve. Their explanation for not pursuing their contempt action was that it was better not to exacerbate the dispute by seeking damages. No explanation at all was advanced by either party for their failure to seek permanent relief at an earlier time.

■■■ There was evidence of threats, violence and intimidation in 1970 to justify the issuance of the temporary injunction. Arguably, there was obstruction to the entranceway to the mine in 1971, but no threats, violence or intimidation. The fact that there were disturbances 2 years prior to the hearing would not in and of itself sustain the issuance of a permanent injunction. The disturbances in 1970 and 1971 could not after 2 years of industrial peace reasonably support a finding that the prohibited acts were likely to reoccur. The temporary injunction first issued in this case by the trial court did not vest plaintiff with a permanent right.

> "An injunction does not create a right. It merely protects the rights of plaintiff from unlawful or injurious interference. In thus preventing, it does not give a perpetual or vested right in the remedy, the law governing the injunction, or the effect of it. The plaintiff is not entitled to the same measure of protection at all times and under all circumstances. An injunction decree which is entered upon facts which are not of such a permanent character

as to be substantially impervious to change, is both executory and ambulatory. It marches along with time. 28 Am. Jur., sec. 314, at 485." (*Illinois Central R.R. Co. v. Illinois Commerce Com.*, 387 Ill. 256, 272-73.)

In our opinion the march of time mandated the dismissal of the temporary injunction and precluded the issuance of the permanent injunction. The temporary injunction is therefore dismissed and the permanent injunction is vacated.

Temporary injunction dismissed; permanent injunction vacated.

EBERSPACHER and CARTER, JJ., concur.